# EXHIBIT 4

LEXSEE



Analysis
As of: Mar 11, 2013

**NEPTALI JARAMILLO and IRA NAVARRO, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. GARDA, INC., GARDA CL GREAT LAKES, INC. and DANIEL WEBB, Defendants.**

**Case No. 12 C 662**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2012 U.S. Dist. LEXIS 149468**

**October 17, 2012, Decided**
**October 17, 2012, Filed**

**PRIOR HISTORY:** Jaramillo v. Garda, Inc., 2012 U.S. Dist. LEXIS 55486 (N.D. Ill., Apr. 20, 2012)

**CORE TERMS:** transportation, carrier's, secretary, driver, interstate commerce, exemption, lbs, bulletin, summary judgment, motor vehicles, overtime, drove, overtime provisions, periods of time, leave to amend, interstate, transport, genuine, driving, driven, exempt, trucks, amend, trip, armored, covered employee, week-by-week, non-moving, messenger, deference

**COUNSEL:** [*1] For Neptali Jaramillo, Ira Navarro, Plaintiffs: James B. Zouras, Mark Bryan Goldstein, Ryan F Stephan, Stephan, Zouras, LLP, Chicago, IL.

For Garda, Inc., Garda CL Great Lakes, Inc., Daniel Webb, Defendants: David Loren Christlieb, LEAD ATTORNEY, Amanda Elaine Inskeep, Catherine Sarah Lindemann, Littler Mendelson, P.C., Chicago, IL; Christina A. Andronache, Littler Mendelson, Chicago, IL.

**JUDGES:** Hon. Harry D. Leinenweber, United States District Judge.

**OPINION BY:** Harry D. Leinenweber

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion for Summary for Judgment. For the reasons stated herein, the Motion is granted.

**I. BACKGROUND**

Defendant Garda CL Great Lakes, Inc. ("Garda") is a secured transportation service company that provides armored vehicle transportation. Plaintiffs are past and current drivers or messengers at Garda's Broadview, Illinois branch. Drivers at Garda are assigned to various routes for pickups and deliveries, while messengers assist drivers in loading the armored vehicles.

At the Broadview branch, Garda's business includes transporting coin, currency, checks, negotiable instruments, and other valuables to and from customers. Drivers at the Broadview branch make biweekly trips [*2] between the Federal Reserve in Chicago and the Federal Reserve in Davenport, Iowa. Drivers also transport coin and currency to and from Milwaukee, Wisconsin and Indianapolis, Indiana five days a week.

Garda's Broadview branch utilizes a fleet of more than 100 armored vehicles. The majority of these vehicles have a gross vehicle weight rating ("GVWR") of more than 10,001 pounds ("large vehicles"). A limited number of vehicles have a GVWR of less than 10,001 pounds ("small vehicles"). Plaintiffs have driven both large and small vehicles as employees for Garda.

Garda is a Federal Motor Carrier Safety Administration ("FMCSA") certified company and holds U.S. Department of Transportation ("DOT") FMCSA Number USDOT # 163997. This certification requires Garda to comply with FMCSA's rules, regulations, and procedures.

Plaintiffs filed this lawsuit against Defendant Garda, Garda, Inc., and Daniel Webb, Garda's Broadview Branch Manager, (collectively the "Defendants") under the Illinois Minimum Wage Law ("IMWL," 820 Ill. Comp. Stat. 105/1, *et seq.*), and the federal Fair Labor Standards Act, ("FLSA," 29 U.S.C. §§ 201 *et seq.*). Plaintiffs allege that Defendants failed to pay Plaintiffs the appropriate [*3] overtime rate for hours worked in excess of 40 hours per week. Plaintiffs brought their claims as a collective action under the FLSA and as a class action under the Illinois labor laws. Defendants now move for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. A dispute is material if it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If the moving party satisfies its burden, the non-movant must present facts to show a genuine dispute exists to avoid summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009). To establish a genuine issue of fact, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Sarver v. Experian Info. Sys.*, 390 F.3d 969, 970 (7th Cir. 2004).

## III. DISCUSSION

Defendants [*4] move for summary judgment arguing that Plaintiffs, and all others similarly situated, are subject to the jurisdiction of the Secretary of Transportation, ("SOT"), thus making the overtime provisions of FLSA and IMWL inapplicable. Defendants claim the Motor Carrier Act ("MCA") precludes Plaintiffs from recovering overtime pay as a matter of law. Specifically, Defendants contend that SOT has jurisdiction because (1) Defendants' business involves interstate commerce; (2) Defendants' vehicle fleet is mainly composed of large vehicles; and (3) Plaintiffs in this case are drivers who drove large vehicles at some point during their employ-

ment or could be expected to drive a large vehicle on any given day of their employment.

Plaintiffs [*5] contend summary judgment should be denied because the SOT and the MCA should not automatically exempt Plaintiffs from receiving overtime wages. Plaintiffs argue that in the weeks that individual Plaintiffs drove only small vehicles, the MCA overtime exemption should not apply. Plaintiffs urge this Court to undergo a week-by-week analysis to determine whether a named Plaintiff exclusively operated a small vehicle, and in those weeks, find the MCA exemption inapplicable.

## A. FLSA and MCA

The FLSA requires employers to pay employees one and one-half times their normal hourly wage for each hour they work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Generally, employees of a motor carrier that engages entirely in intrastate commerce are subject to the Secretary of Labor's jurisdiction and consequently the overtime provisions of the FLSA. *Johnson v. Hix Wreck Service, Inc.*, 651 F.3d 658, 660 (7th Cir. 2011). However, "employees of a motor carrier that engages in interstate commerce may come under the Secretary of Transportation's jurisdiction under the Motor Carrier Act [MCA]." *Id.* at 660-61 citing 49 U.S.C. § 31502. These employees are "exempt from the FLSA's maximum hour and overtime [*6] provisions pursuant to the FLSA's motor carrier exemption." *Id.* While many motor carrier employers engage in both intrastate and interstate commerce, an employee "cannot be subject to the jurisdiction of both the Secretary of Labor and the Secretary of Transportation simultaneously." *Id.* citing *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1155 (9th Cir. 1994). It is the burden of the motor carrier employer to show that the employee is exempt from the overtime provisions of the FLSA. *Klein v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 990 F.2d 279, 282 (7th Cir. 1999).

The Seventh Circuit has explained that the applicability of the MCA exemption depends on the activities of individual employees. *See Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895 (7th Cir. 2009). An employee is subject to the MCA exemption if he/she: (1) is employed with "a [motor] carrier subject to the power of the Secretary of Transportation"; (2) is engaged "in activities directly affecting the operational safety of motor vehicles"; and (3) is "engaged in interstate commerce." *Thompson v. K.R. Denth Trucking, Inc.*, No. 1:10-CV-0135-TWP-MJD, 2011 U.S. Dist. LEXIS 13941, 2011 WL 649680 at *3 (S.D. Ind. Feb. 11, 2011).

Prior to August 10, 2005, [*7] a motor carrier was defined under the MCA as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12) (2004). However, on August 10, 2005, Con-

gress enacted the Safe, Accountable, Flexible and Efficient Transportation Equity Act: A Legacy for Users (the "SAFETEA-LU"), amending the definition of motor carrier and motor private carrier to include only commercial motor vehicles. 49 U.S.C. § 13102(14) (2005). This amendment had the effect of altering the class of employees exempt from the FLSA and removing from the Secretary of Transportation's jurisdiction any employee who did not operate a commercial motor vehicle. See 49 U.S.C. § 31132(1). Pursuant to the 2005 amendment, commercial vehicles were defined as vehicles having "a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds." 49 U.S.C. §31132(1)(A).

On June 6, 2008, Congress enacted the SAFETEA-LU Technical Corrections Act of 2008 (the "TCA"). Pub.L 110-244, 122 Stat. 1572 (2008). Section 305 of TCA replaced the previously changed language in SAFETEA-LU, restoring the 2004 "motor carrier" language in lieu of the 2005 commercial motor vehicle definition. However, Section 306(c) of the TCA [*8] provided that the FLSA shall apply to a "covered employee" notwithstanding Section 13(b)(1) (the exemptions section) of FLSA. TCA defined a "covered employee" as one:

> (1) who is employed by a motor carrier or motor private carrier (as such terms are defined by Section 13102 of Title 49, United States Code, as amended by Section 305);

> (2) whose work, in whole or part, is defined as:

>> (A) that of a driver, driver's helper, loader, or mechanic; and
>> (B) affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles --

>>> (i) designed or used to transport more than 8 passengers (including the driver) and not used to transport for compensation; or

>>> . . .
>>> (iii) used in transporting material . . .;

> and

>> (3) who performs duties on motor vehicles weighing less than 10,000 pounds or less.

Pub.L 110-224, 122 Stat. 1572, Section 306(c).

Thus, the TCA effectively retained the weight requirement for vehicles in order for the Secretary of Transportation to have jurisdiction under the MCA. What the TCA failed to articulate though, was whether employees who work on both vehicles weighing 10,001 pounds and vehicles [*9] less than 10,000 pounds would be subject to the jurisdiction of the Secretary of Transportation. Plaintiffs argue that because they have worked on small vehicles for periods of time at Garda, they should be considered "covered employees" pursuant to the TCA. Plaintiffs do not contest that Garda is engaged in interstate commerce. Nor do they contest that Garda is a carrier subject to the Secretary of Transportation, or that Plaintiffs engage in activities which directly affect the operational safety of vehicles. Instead, Plaintiffs contend that they are not covered by the MCA because in certain weeks certain employees worked exclusively in vehicles with a GVWR of less than 10,001 pounds. Plaintiffs point to the language of the TCA and the Department of Labor's Field Assistance Bulletin (the "Bulletin") as support. See Field Assistance Bulletin 2010-2, November 4, 2010 (explaining that the "four month" rule stems from the Department of Transportation's interpretation of the MCA . . . conferring that agency jurisdiction over employees for a four-month period beginning with the date they could have been called upon to, or actually did, engage in . . . interstate activities [and] triggering [*10] the overtime pay exemption for that period.")

The Court acknowledges that the Bulletin Plaintiffs' reference has the potential to support Plaintiffs' position.

However, the Court finds the Bulletin to lack clarity regarding the issue of employers with mixed vehicle fleets like Garda and finds the Bulletin contrary to binding Seventh Circuit authority. Thus, the Court does not afford the Bulletin great deference. *See Howard v. City of Springfield*, 274 F.3d 1141, 1146 (7th Cir. 2001) (stating an interpretative bulletin . . . from the Department of Labor does not have the force of binding law . . . [and] [i]t is therefore not entitled to deference . . ."); *see also Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2166-67, 183 L. Ed. 2d 153 (2012) (refusing to give *Auer* deference to the Department of Labor's interpretation of its own regulations because "agencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires.").

What this Court finds persuasive is the Seventh Circuit decision in *Collins v. Heritage Wine Cellars, LTD.*, 589 F.3d 895 (7th Cir. 2009). In *Collins*, the court addressed the issue of whether a portion of transportation that is entirely within [*11] Illinois is nonetheless interstate commerce within the meaning of the MCA. *Id.* After finding that it was, Judge Richard Posner addressed the plaintiffs' additional argument which was that because some plaintiffs drove trucks lighter than 10,001 pounds between 2005 and 2008, the MCA exemption should not apply. *Id.* at 901. In rejecting this argument, Posner stated,

> [d]ividing jurisdiction over the same drivers, with the result that their employer would be regulated under the Motor Carrier Act when they were driving the big trucks and under the Fair Labor Standards Act when they were driving trucks that might weigh only a pound less, would require burdensome record-keeping, create confusion, and give rise to mistakes and disputes.

*Id.*

The Court finds the plaintiffs' argument in *Collins* identical to the Plaintiffs' argument here, and as such, refuses to undergo a week-by-week analysis to determine what regulatory overtime scheme should apply to each individual Plaintiff for each week of work. The Court finds this would be, as Judge Posner stated, burdensome.

Moreover, Plaintiffs' attempt to distinguish *Collins* is futile. Plaintiffs allege that unlike the *Collins*, some of the named Plaintiffs [*12] here engaged in large vehicles so infrequently that those trips should be considered "de minimis." Pl. Opp'n to Defs.' Mot. for Summ. J. at 9. Plaintiffs rely on *McGee v. Corporate Express Delivery Systems* and *Vidinliev v. Carey International, Inc.* to

support their position. *McGee v. Corporate Express Delivery Systems*, No. 01-C-1245, 2003 U.S. Dist. LEXIS 20855, 2003 WL 22757757 (N.D. Ill. Nov. 20, 2003); *Vidinliev v. Carey International, Inc.*, 581 F.Supp.2d 1281 (N.D. Ga. 2003). The Court not only finds both cases distinguishable, but also notes that both cases occurred prior to the Seventh Circuit's holding in *Collins*. Thus, the Court is not persuaded.

Since *Collins*, the Seventh Circuit again addressed the issue the applicability of the MCA exemption to FLSA in *Johnson v. Hix Wrecker Service, Inc*, (notably, a case decided after the Department of Labor issued the Bulletin). *Johnson v. Hix Wrecker Service, Inc.*, 651 F.3d 658 (7th Cir. 2011). In *Johnson*, the Seventh Circuit reversed a district court's decision granting summary judgment to an employer because the Seventh Circuit found the employer's evidence insufficient to show that his employee fell within the MCA exemption. *Id.* at 662. In making its determination, the [*13] Seventh Circuit found that the employer's "affidavit . . . [failed to] show that Hix Wrecker [the employer] engaged in interstate commerce within a "reasonable period of time" prior to the time during which it claims the exemption . . . [a]nd the affidavit does not establish that Johnson [plaintiff] was subject to being used in interstate commerce during a four-month period or during any other "reasonable period of time."" *Id.* citing 46 Fed. Reg. 37,902.

In *Johnson*, the Seventh Circuit relied on the Department of Transportation's interpretation of MCA which attempted to clarify the extent of the Secretary of Transportation's jurisdiction. It states:

> [For an employee to fall under the Secretary of Transportation's jurisdiction] . . . the carrier must be shown to have engaged in interstate commerce within a reasonable period of time prior to the time at which jurisdiction is in question. The carrier's involvement in interstate commerce must be established by some concrete evidence such as an actual trip in interstate commerce . . . If jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be presented that the carrier has engaged in interstate [*14] commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs. . . . [Additionally] evidence of driving in interstate commerce should be accepted as proof that the driver is subject to [the Secretary of Transportation's jurisdiction] for a 4-month period from the date of proof.

46 Fed. Reg. 37,902.

In *Johnson*, the only evidence the employer submitted as proof of the Secretary of Transportation's jurisdiction was an affidavit from its corporate secretary which stated that the employer's drivers could be subject to being assigned to an interstate trip on any given day. *Id.* at 662-63.

Unlike the affidavit in *Johnson*, here, Defendants provided the Court a multitude of exhibits detailing the driving records for every named Plaintiff in this case. The Court finds these records telling. The records not only reveal that every named Plaintiff has driven a large vehicle, but also show that 21 out of the 34 named Plaintiffs have driven large trucks more than 80 percent of the time at Garda. Moreover, even Plaintiff Jaramillo, the individual Plaintiff who drove large vehicles the least amongst all other Plaintiffs, still drove large vehicles on 11 different   [*15] occasions. The Court finds this to be a "reasonable amount of time," particularly because it is clear that Plaintiff Jaramillo could be expected to drive a large vehicle on any given day of his employment with Garda. Indeed, Defendants have provided "concrete evidence" that all Plaintiffs could be expected to be a driver or messenger in a large vehicle on any given day of their employment. *Id.* Because of this, the Court finds Defendants have satisfied their burden of proof regarding each employee's exemption from FLSA.

## B. Plaintiff's Request to Amend their Complaint

At the end of Plaintiffs' Response to Defendants' Motion for Summary Judgment, Plaintiffs request leave to amend their Complaint to "resolve any remaining disputes." Pl. Opp. to Def.'s Mot. for Summ. J. at 12. Specifically, Plaintiffs seek to amend the definition of the class as follows:

> All individuals who were employed or are currently employed, by one or more of the Defendants, its subsidiaries or affiliated companies as armored transport employees or any other similarly titled position at any time during the relevant statute of limitations period and who exclusively drove a small vehicle (less than 10,001 lbs.) during   [*16] any work week.

*Id.*

Defendants oppose Plaintiffs request to amend their Complaint, arguing that the proposed modification of the class definition would have the same deficiencies as the current Complaint.

Federal Rule of Civil Procedure 15 states that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15. However, under Rule 15, a court "may deny leave to amend on the grounds of undue delay, bad faith, dilatory motive, prejudice, or futility." *Guise v. BWM Mortg., LLC,* 377 F.3d 795, 801 (7th Cir. 2004) citing *Indiana Funeral Directors Ins. Trust v. Trustmark Ins. Corp.,* 347 F.3d 652, 655 (7th Cir. 2003).

The Court finds here that even if it granted Plaintiffs leave to amend their class definition, the class would still suffer the same flaws as the current class definition, and thus, would not survive summary judgment. This is due in part because of the holding in *Collins,* which expressly denied an employee's request to undergo a week-by-week analysis to determine whether FLSA applied, and in part because Garda has provided the Court sufficient evidence to determine that all employees at Garda can be expected to drive a large vehicle on any given day of their   [*17] employment. *See Collins,* 589 F.3d at 901; Def. Reply Br. in Supp. of Mot. for Summ. J. Ex. 1. Moreover, the fact that the courts have consistently held that an employee cannot be subject to the jurisdiction of the Secretary of Transportation and the Department of Labor simultaneously provides added support. See *Johnson,* 651 F.3d at 660. As such, the Court denies Plaintiffs Motion to Amend their Complaint.

## IV. CONCLUSION

For the reasons stated herein, the Court grants Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

/s/ Harry D. Leinenweber

Harry D. Leinenweber, Judge

United States District Court

**DATE:** 10/17/2012

LEXSEE



Positive
As of: Mar 11, 2013

## GERONIMO H. HERNANDEZ, ET AL., Plaintiffs, vs. BRINK'S, INCORPORATED, Defendant.

### Case No. 08-20717-CIV-MOORE/SIMONTON

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

### 2009 U.S. Dist. LEXIS 2726; 157 Lab. Cas. (CCH) P35,528

**January 15, 2009, Decided**
**January 15, 2009, Entered**

**CORE TERMS:** carrier, driver, exemption, transportation, motor vehicle, Motor Carrier Act, messenger, mixed, interstate, workweek, pounds, technicians, helper, non-commercial, fleet, interstate commerce, foreign commerce, summary judgment, armored vehicle, entity, overtime compensation, retroactively, transport, Technical Corrections Act, de minimus, safety-affecting, transported, intrastate, genuine, sub-fleet

**COUNSEL:** [*1] For Geronimo H. Hernandez, Vladimir Sotomayor, Ociel Guada, Francisco Roque, Frank Padron, Victor Gomez, Humberto Zamord, Angel Carpio, and other similarly-situated individuals, Plaintiffs: Jason Saul Remer, LEAD ATTORNEY, Remer & Georges-Pierre, Miami, FL.

For Luis F. Chaveco, Consol Plaintiff: Jason Saul Remer, LEAD ATTORNEY, Remer & Georges-Pierre, Miami, FL.

For Brink's, Incorporated, Defendant: Cathy J. Beveridge, LEAD ATTORNEY, Fowler White Boggs Banker, Tampa, FL; Ira M. Saxe, Jeffrey W. Pagano, Stafford A. Woodley, Jr., Crowell & Moring LLP, New York, NY.

**JUDGES:** K. MICHAEL MOORE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** K. MICHAEL MOORE

**OPINION**

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment (dkt # 54).

UPON CONSIDERATION of the Motion, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

### I. BACKGROUND

Plaintiffs bring this action for unpaid overtime compensation under the Fair Labor Standards Act ("FLSA"). 29 U.S.C. §§ 210-219. "[Defendant] Brink's is a secured transportation service company, engaged in the business of providing armored [*2] vehicle transportation, protection and security of its customers' coin, currency, negotiable instruments and other valuables." Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Def.'s Facts"), P 2 (dkt # 56). [1] Plaintiffs include: (1) Geronimo H. Hernandez ("Hernandez"), a Driver; (2) Vladimir Sotomayor ("Sotomayor"), a Messenger; (3) Ociel Guada ("Guada"), a Driver; (4) Francisco Roque ("Roque"), a Driver; (5) Frank Padron (Padron"), a Driver; (6) Victor Gomez ("Gomez"), a Driver; (7) Angel Carpio ("Carpio"), a Messenger; (8) Humberto Zamora ("Zamora"), a Messenger; (9) Luis Chaveco ("Chaveco"), a Messenger and/or Automatic Teller Machine ("ATM") Technician.

2:13-cv-10353-AJT-MKM   Doc # 17-6   Filed 03/11/13   Pg 8 of 58   Pg ID 116

2009 U.S. Dist. LEXIS 2726, *; 157 Lab. Cas. (CCH) P35,528

Id. PP 3-4; Res. in Opp. To Def.'s Mot. for Summ. J., Ex. B PP 7-10 (dkt # 62); Am. Compl. (dkt # 5).

> 1 Citations to the Parties' Statements of Material Fact incorporate by reference the underlying documents.

Brink's Drivers are responsible for driving the armored vehicles, conducting pre-operation vehicle safety checks, and completing the Brink's Driver Vehicle Condition Form. Def.'s Facts, PP 60-62. Messengers exercise supervision over the armored vehicle crew, assist in safely guiding the vehicle when [*3] it is traveling in reverse, and help to load and unload the armored vehicles before and after they are used. Id. PP 60-62. 30, see Mem. of Law in Support of Mot. for Summ. J., at 5 (dkt # 55). ATM Technicians are Messengers who are also responsible for withdrawing and replenishing funds in ATM's, as well as carrying out other messenger responsibilities. Def.'s Facts, P 33. Messengers and ATM Technicians are also qualified to drive the vehicle if necessary. Id. P 10.

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). An issue of fact is "material" if it is a legal element of [*4] the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Id. However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III. ANALYSIS

### A. The FLSA's Motor Carrier Exemption

Brink's asserts it is entitled to summary judgment because it is exempt from the FLSA's wage and hour requirements. Section 213(b)(1) of the FLSA [*5] provides that it does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). The Secretary of Transportation has jurisdiction over transportation by a motor carrier of persons or property in interstate or foreign commerce. 49 U.S.C. § 13501. Under the Motor Carrier Act, the Secretary of Transportation may regulate "qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier." 49 U.S.C. § 31502(b)(1).

### 1. Claims Before August 10, 2005

Plaintiffs seek to recover unpaid overtime compensation earned between March 19, 2005 and March 19, 2008, the date that the Complaint in this action was filed. On August 10, 2005, the definition of a motor carrier for purposes of the FLSA's motor carrier exemption was amended by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"). Pub.L. 109-59, 119 Stat. 1144 (2005). Prior to August 10, 2005, a motor carrier was defined as "a person providing motor vehicle transportation for [*6] compensation." 49 U.S.C. § 13102(14) (effective until August 9, 2005) (providing the relevant definition of motor carrier under 49 U.S.C. § 31501(2)). This definition applies to Plaintiffs' overtime compensation claims for hours worked prior to August 10, 2005, because the SAFETEA-LU amendment of the definition of motor vehicle does not apply retroactively. Musarra v. Digital Dish, Inc., 454 F. Supp.2d 692, 703 (S.D.Ohio 2006) (finding that SAFETEA-LU does not include a clear statement by Congress that it applies retroactively); see Landgraf v. USI Film Products, 511 U.S. 244, 280, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994) (requiring a clear statement from Congress for a civil statute to apply retroactively). Accordingly, this Court will apply the pre-SAFETEA-LU definition of a motor carrier to Plaintiffs' claims for overtime compensation accrued before August 10, 2005.

2:13-cv-10353-AJT-MKM   Doc # 17-6   Filed 03/11/13   Pg 9 of 58   Pg ID 117

2009 U.S. Dist. LEXIS 2726, *; 157 Lab. Cas. (CCH) P35,528

The Department of Labor has issued regulations concerning the scope of the FLSA's motor carrier exemption. The Secretary of Transportation has authority to establish maximum hours and qualifications of service of employees when two conditions are met: (1) the employees must be "employed by carriers whose transportation of passengers or property by motor [*7] vehicle is subject to [the Secretary of Transportation's] jurisdiction", and (2) the employees must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a); see also Baez v. Wells Fargo Armored Serv. Corp., 938 F.2d 180, 181-82 (11th Cir. 1991). If these two conditions are met, the FLSA's motor carrier exemption is triggered and the employee is exempt from the FLSA's wage and hour provisions.

a. Interstate Commerce

Brink's is a motor carrier that transports property in interstate commerce because Brink's transports checks destined for banks outside of Florida and transports property destined for interstate and foreign locations. It is unnecessary for an employee to engage in interstate travel as long as the property being transported is bound for an interstate destination. Baez, 938 F.2d at 182 (finding that the FLSA's motor carrier exemption applied to drivers and driver's helpers who only traveled intrastate but who transported checks bound for banks outside of Florida); Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37 (5th Cir. 1962) [*8] (applying motor carrier exemption to employees traveling intrastate but who transported empty soft drink bottles bound for another state); Alvarado v. I.G.W.T. Delivery Sys., Inc., 410 F. Supp.2d 1272, 1277 (S.D.Fla. 2006) (applying motor carrier exemption to employees who only traveled intrastate but transported letters and packages bound for interstate destinations). Here, Brink's and Plaintiffs were engaged in transporting checks and other property destined for interstate or foreign destinations. Accordingly, the nature of Brink's relevant activities fall squarely within the meaning of interstate commerce for purposes of the Motor Carrier Act. Not. of Filing Exs. in Supp. of Mot. for Summ. J., Ex. 3, PP 36-38 (dkt # 58); Not. of Filing Exs. in Supp. of Def.'s Rep. to Pl.'s Res. In Opp. to Mot. for Summ. J., Ex. 45, (dkt # 64); see Def.'s Facts, P 69-71.

b. Activities Directly Affecting the Safety of Operation

Plaintiffs' job-related duties directly affect the safety of operation of motor vehicles in the transport of property in interstate commerce. "The exemption of an employee . . . depends both on the class to which his employer belongs and on the class of work involved in the employee's [*9] job." 29 C.F.R. § 782.2(a). For purposes of the Motor Carrier Act, a driver includes:

> Individuals whose driving duties are concerned with transportation some of which is in intrastate commerce and some of which is in interstate or foreign commerce within the meaning of the Motor Carrier Act; [and] individuals who ride on motor vehicles engaged in transportation in interstate or foreign commerce and act as assistant or relief drivers of the vehicles in addition to helping with loading, unloading, and similar work."

29 C.F.R. §782.3(a). A driver's helper includes "an employee other than a driver, who is required to ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.4(a). Driver's helpers include armed guards on armored trucks because they directly affect the safety of operation of armored trucks in interstate or foreign commerce. Id. An employee who must exit the vehicle and flag the driver or perform a similar duty when a vehicle is being turned on a busy highway or when entering or exiting a driveway is also a driver's helper. Id. An employee may be a helper "even though such safety-affecting [*10] activities constitute but a minor part of his job." 29 C.F.R. § 782.4(b); see also Baez, 938 F.2d at 180 (affirming summary judgment finding that guards on an armored vehicle were driver's helpers). Therefore, drivers and driver's helpers who meet the foregoing criteria are exempt from the FLSA's overtime requirements because of the nature of their duties, and not merely because of the employee's job title. 29 C.F.R. §782.3(b).

Here, the job duties of each of the Plaintiffs, including Driver, Messenger, and ATM Technicians, qualify Plaintiffs as drivers or driver's helpers. Given this Court's finding that Brink's engages in transportation of property in interstate commerce, Plaintiffs who worked as Drivers fall within the regulation's definition of drivers who affect the safety of operation and are therefore covered by the FLSA's motor carrier exemption. Likewise, Messengers and ATM Technicians are also covered by the motor carrier exemption as driver's helpers because they are "employee[s] other than a driver, who [are] required to ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.4(a). [*11] ATM Technicians also carry out other Messenger responsibilities and thus Messengers and ATM technicians would be responsible for flagging the vehicle as it travels in re-

verse under various circumstances and must also be qualified to drive if necessary. The class and nature of the duties of Messengers and ATM Technicians place these employees within the scope of the FLSA's motor carrier exemption. Accordingly, Plaintiff Drivers, Messengers and ATM Technicians are not entitled to overtime compensation under the provisions of the FLSA for hours worked before August 10, 2005.

1. Claims After August 10, 2005

As already stated, the Motor Carrier Act was amended by SAFETEA-LU. After August 10, 2005, the effective date of SAFETEA-LU, the Motor Carrier Act's definition of a motor carrier was changed to "a person providing commercial motor vehicle (as defined in section 31132) transportation for compensation." 49 U.S.C. § 13102(14) (effective until June 5, 2008) (providing the applicable definition of motor carrier pursuant to 49 U.S.C. § 31501(2)). A commercial motor vehicle is defined, in relevant part, as "a self-propelled or towed vehicle used on the highways in interstate commerce to transport [*12] passengers or property, if the vehicle has a gross vehicle rating or gross weight of at least 10,001 pounds, whichever is greater." 49 U.S.C. § 31132(1). Therefore, after the enactment of SAFE-TEA-LU, the Secretary of Transportation had jurisdiction over a person transporting property in interstate commerce if the transporting vehicle had the greater of a gross vehicle rating ("GVR") or weight of at least 10,001 pounds.

Plaintiffs contend that they are not covered by the FLSA's motor carrier exemption because in certain weeks they worked partially in vehicles with a GVR and weight of less than 10,001 pounds, and in a certain weeks some worked entirely in vehicles with a GVR and weight of less than 10,001 pounds. Here, Brink's operated a fleet of armored vehicles in which approximately 95 of 104 total vehicles were at least 10,001 pounds. Def's Facts, PP 38-44 Viewing the facts in the light most favorable to Plaintiffs, it appears that Plaintiffs Hernandez, Roque, Padron, Gomez, Chaveco, Carpio, and Sotomayor did at least some work in the approximately nine vehicles with a GVR or weight under 10,001 pounds during certain workweeks. Res in Opp. To Def.'s Mot. for Summ. J., Exs. A, C, D, [*13] E, F, G, I. Plaintiffs Hernandez, Sotomayor, Roque, Chaveco each also worked between two and four complete workweeks in vehicles with a GVR or weight under 10,000 pounds. Id. at Exs. A, B, C, F.

Plaintiffs are covered by the FLSA's motor carrier exception, even though they may have worked in a vehicle with a GVR and weight of less than 10,001 pounds during certain work weeks. The use of a mixed fleet of vehicles which have a GVR or weight of over and under

10,001 pounds raises the question of whether and to what extent the Secretary of Transportation has jurisdiction over the carrier. The Department of Labor regulations do not provide guidance on the use of a mixed fleet, but do address the somewhat analogous issue of mixed duties involving safety of operation. "As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is . . . called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities . . . he comes within the exemption in all workweeks when he is employed at such job." 29 C.F.R. § 782.2(b)(3). "Where this is the case, the rule applies regardless of the proportion of the employee's [*14] time or of his activities which is actually devoted to such safety-affecting work in a particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting 'safety of operation.'" Id. "On the other hand, where the continuing duties are so trivial, casual, and insignificant as to be de minimus, the exemption will not apply to him in any workweek so long as there is no change in his duties." Id. These regulations appear to be based on the general principle that when mixed activities occur, the Motor Carrier Act favors coverage of the employee during the course of employment in that job, unless the regular and ongoing duties of the employee have only a de minimus effect on the safety of operation.

The issue of whether an entity meets the Motor Carrier Act's definition of a motor carrier by its use of commercial motor vehicles with a GVR or weight of at least 10,001 pounds is not entirely analogous to the mixed duties analysis. In the case of mixed duties, employees can be distinguished by the effect of their duties on the safety of operations without affecting the carrier's status as a motor carrier. In the case of [*15] a mixed fleet of vehicles, however, where employees sometimes use vehicles that do not qualify as commercial motor vehicles, the question arises as to whether those employees are covered by the FLSA's motor carrier exemption. The answer depends on whether and to what extent an entity with a mixed fleet is a motor carrier for purposes of the Motor Carrier Act.

Under a plain reading of the definition of a motor carrier, an entity qualifies as a motor carrier only with respect to qualifying commercial vehicles, and is not a motor carrier with respect to non-commercial vehicles. Therefore, a mixed fleet may be viewed as two separate sub-fleets, only one of which classifies the entity as a motor carrier. This approach results in a legal fiction that designates a single entity as a motor carrier with respect to its sub-fleet of commercial motor vehicles, and as a non-motor carrier with respect to its sub-fleet of non-commercial vehicles. Thus, the only remaining

2:13-cv-10353-AJT-MKM   Doc # 17-6   Filed 03/11/13   Pg 11 of 58   Pg ID 119

2009 U.S. Dist. LEXIS 2726, *; 157 Lab. Cas. (CCH) P35,528

question is whether employees who have mixed duties on both sub-fleets are covered by the FLSA's motor carrier exemption.

Reverting to the principle derived from regulations governing mixed duties, when mixed activities occur, the [*16] Motor Carrier Act favors coverage of the employee during the course of employment. Applying this principle to duties on a mixed fleet, as long as an employee's duties affect the safety of operation of vehicles covered by the Motor Carrier Act, the employee is covered by the motor carrier exemption "regardless of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting 'safety of operation.'" 29 C.F.R. § 782.2(b)(3). Conversely, if an employee's principal duties involve tasks related to non-commercial vehicles, and only sporadically assists with duties involving commercial vehicles, such duties would likely have "no substantial direct effect on such safety of operation" and would be so "trivial, casual, and insignificant as to be de minimus." Id.

Plaintiffs, during the course of their employment, engaged in duties affecting the safety of operations on commercial motor vehicles. None of Plaintiffs job duties involved primarily non-commercial vehicles to an extent that would render the effect of their duties [*17] on the safety of operation of commercial motor vehicles de minimus. Each Plaintiff worked on both commercial and non-commercial vehicles and their duties therefore sufficiently impacted the safety of operations of commercial motor vehicles to bring them within the scope of the FLSA's motor carrier exemption. See Collins v. Heritage Wine Cellars, Ltd., No. 07-CV-1246 (RMD), 2008 U.S. Dist. LEXIS 104555, 2008 WL 5423550, at * 19-20 (N.D. Ill. 2008) (holding that an entity with a mixed fleet constitutes a motor carrier under the Motor Carrier Act, thereby triggering the FLSA's motor carrier exception); Tidd v. Adecco USA, Inc., No. CV-07-11214 (GAO), 2008 U.S. Dist. LEXIS 69825, 2008 WL 4286512, at *2 (D.Mass 2008) (same).

Although four Plaintiffs reported periods of two to four weeks during which they worked on non-commercial vehicles, these periods do not sufficiently change the nature of their employment to exclude them from coverage of the Motor Carrier Act. The regulations governing the FLSA's motor carrier exemption state that "[w]here the same employee of a carrier is shifted from one job to another periodically or on occasion, the application of the exemption to him in a particular workweek [depends] . . . on the job or jobs in which he [*18] is employed in that workweek." 29 C.F.R. § 782.2(b)(4). It is thus evident that when an employee's duties change so significantly that the change in duties constitutes a change from one job to another, the applicability of the FLSA's motor carrier exemption may vary from week to week. However, even during the weeks in which Plaintiffs worked a full week on a non-commercial vehicle, the nature of their duties did not meaningfully change to a degree that would constitute a change from one job to another. Therefore, Plaintiffs were covered by the FLSA's motor carrier exception, even during workweeks when they worked on non-commercial vehicles.

## C. The SAFETEA-LU Technical Corrections Act

On June 6, 2008, Congress passed the SAFE-TEA-LU Technical Corrections Act of 2008 (the "Technical Corrections Act"). Pub.L. No. 110-224, 122 Stat. 1572 (2008). Section 305 of the Technical Corrections Act is labeled "Motor Carrier Transportation Registration" and states:

> (a)   GENERAL   REQUIRE-MENTS.-Section 31138 of title 49, United States Code, is amended- . . . . (c) DEFINITIONS RELATING TO MOTOR CARRIERS.-Paragraphs 6(B), 7(B), (14), and (15) of Section 13102 of such title are each amended by striking "commercial [*19] motor vehicle (as defined in section 31132)" and inserting "motor vehicle."

Id. The effect of this amendment was to change the definition of a motor carrier back to the same definition that was in effect prior to the August 10, 2005, SAFE-TEA-LU amendment. However, the Technical Amendment Act's change to the definition of a motor carrier is not retroactive and does not impact the period from August 10, 2005, to June 5, 2008, when the SAFETEA-LU amendment was in effect. Vidinliev v. Carey Int'l, Inc., 581 F. Supp.2d 1281, 1288-1291 (N.D.Ga. 2008) (holding that the Technical Correction Act's amendment to the definition of a motor carrier does not apply retroactively). This Court adopts the reasoning in Vidinliev v. Carey Int'l, Inc. supporting the conclusion that the Technical Correction Act's amendment to the definition of a motor carrier does not apply retroactively. Id. Therefore, even after the Technical Corrections Act, Plaintiffs are covered by the FLSA's motor carrier exemption, for the reasons stated in subsection A(1) of this Order. Accordingly, Plaintiffs are not entitled to overtime compensation under the FLSA.

## IV. CONCLUSION

For the foregoing reasons, it is

2009 U.S. Dist. LEXIS 2726, *; 157 Lab. Cas. (CCH) P35,528

ORDERED AND ADJUDGED   [*20] that Defendant's Motion for Summary Judgment (dkt # 54) is GRANTED. The Clerk of the Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 15th day of January, 2009.

/s/ K. M Moore

K. MICHAEL MOORE

UNITED STATES DISTRICT JUDGE

LEXSEE



Analysis
As of: Mar 11, 2013

## WILLIAM T. HORN, et al., Plaintiffs v. DIGITAL CABLE & COMMUNICA-
## TIONS, INC., et al., Defendants

### Case No.: 1:06 CV 325

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
### OHIO, EASTERN DIVISION

### 2008 U.S. Dist. LEXIS 111869

### June 11, 2008, Decided
### June 12, 2008, Filed

**SUBSEQUENT HISTORY:** Motion granted by, Dismissed by, Summary judgment denied by, in part Horn v. Digital Cable & Communs., Inc., 2008 U.S. Dist. LEXIS 109592 (N.D. Ohio, Nov. 18, 2008)

**CORE TERMS:** cable, customer's, warehouse, technician, transportation, summary judgment, interstate, motor vehicle, interstate commerce, exempt, weigh, ship, dishes, SAFETEA-LU Amendment, transporting, transport, shipped, shipper, overtime compensation, genuine issue, material fact, intrastate, private carriers, transported, exemption, overtime, tracking, storage, shipment, transit

**COUNSEL:** [*1] For William T. Horn, Thomas Heathfield, Eric Hess, Charles L. Horn, Joseph S. Kovach, Ronald E. Paolella, Robert Riviotta, Plaintiffs: Daniel J. Nealon, LEAD ATTORNEY, Shaker Heights, OH; John L. Cullen, Law Office of Ronald Frederick, Cleveland, OH; Stourton Scott Smith, Cleveland, OH.

For Digital Cable and Communications, Inc., Alex Bazsuj, Jerry Anderson, Defendants: Jill S. Kirila, LEAD ATTORNEY, David J. Millstone, Squire, Sanders & Dempsey - Cleveland, Cleveland, OH.

**JUDGES:** SOLOMON OLIVER, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SOLOMON OLIVER, JR.

**OPINION**

**ORDER**

Plaintiff William T. Horn and six other employees of Digital Cable brought suit alleging that Digital Cable's compensation plan violated 29 U.S.C. §§ 206(a) and 207(a) of the Fair Labor Standards Act, as well as the Ohio Minimum Fair Wage Standard Law, Ohio Revised Code §§ 4111.01 et seq. and the Ohio Payment Law, Ohio Revised Code § 4113.15. Plaintiff Joseph Kovach has since dismissed all claims against Defendants with prejudice. (ECF No. 27, filed under seal.) Pending before the court is Defendants Digital Cable, et al.'s ("Digital Cable" or "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) against [*2] the remaining Plaintiffs. For the foregoing reasons, the Motion for Summary Judgment is granted in part and denied in part.

## I. BACKGROUND AND PROCEDURAL HISTORY

Defendants, based in Parma, Ohio, deliver, install and service equipment exclusively for Cox Communications ("Cox") based in Atlanta, Georgia. (Aff. of Alex Bajusz P 3.) Cox delivers all necessary goods from outside the state to their warehouse in Parma, Ohio, where Digital Cable's ten to fifteen technicians then transport cable equipment to customer's homes. (*Id.* P 3-4.) This equipment is preprogrammed for two weeks and remains unaltered from out-of-state shipment until reaching the customer's home. (*Id.* P 9.) Cox calculates each shipment to the warehouse using a formula based on current customer needs, projections on market conditions, historical data of units ordered, and other relevant factors. (*Id.* P 6.)

Customers place orders through Cox, who schedule Digital Cable technicians to complete the required work. (*Id.* P 7.) Technicians obtain equipment from the warehouse twice a week, transport the goods using a company vehicle, and complete the work at the customer's home. (*Id.* P 8,10.) If the customer cancels cable service or [*3] the equipment malfunctions, the technicians retrieve the equipment and return the goods to the warehouse. (*Id.* P 13.) The equipment is then shipped out of state for repairs or destruction. (*Id.*) The work completed by Digital Cable technicians is performed in Cleveland and the surrounding areas and is therefore completely intrastate. (*Id.* P 5.)

Cox monitors the equipment using a scanning system. (*Id.* P 8.) Each piece of equipment contains a serial number, which is scanned when the product is transferred to show who presently controls the equipment. (*Id.*) Scanning occurs when the equipment enters the warehouse, when the technician takes equipment from the warehouse to the customer's home, and upon transferring responsibility to the individual customer's number. (*Id.*) Digital Cable technicians are assigned a specific "technician number" to ensure an exact accounting of the goods in transit. (*Id.*) Therefore, Cox has information regarding the exact status of every piece of its cable equipment. (*Id.*)

On February 10, 2006, Plaintiffs filed suit, alleging that Digital Cable's compensation of employees violated 29 U.S.C. §§ 206(a) and 207(a) of the Fair Labor Standards Act ("FLSA"), as well as [*4] the Ohio Minimum Fair Wage Standard Law ("OMFWSL"), Ohio Revised Code §§ 4111.01 *et seq.* and the Ohio Payment Law, Ohio Revised Code § 4113.15. (Compl. PP 52-67.) Plaintiffs seek injunctive and monetary relief, as well as reasonable attorneys' fees and costs in relation to Digital Cable's alleged wrongful denial of overtime compensation to company technicians. (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [*5] Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034, 274 U.S. App. D.C. 340 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that [*6] create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id.*

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

## III. LAW AND ANALYSIS

### A. Fair Labor Standards Act

The FLSA requires employers to pay one and one-half hour of wages to an employee who works more than forty hours in one week. 29 U.S.C. § 207(a)(1)(2000). An exemption to the "maximum hour requirements" exists for employees for whom the Secretary of Transportation may regulate qualifications and maximum working hours under the Motor Carrier Act, 49 U.S.C. § 31502(b)(2005), ("MCA"). This exemption encompasses both "motor carriers" and "motor private carriers" who affect safety. The issue before the court [*7] in the instant case is whether Plaintiffs were "motor private carriers" and thus exempt from the overtime provision of the FLSA before August 10, 2005, and if so, whether they remained "motor private carriers" after the August 10, 2005 amendment.

1. Digital Cable's Status Under the MCA Prior to the August 10, 2005 SAFETEA-LU Amendment

Prior to passing the SAFETEA-LU Amendment on August 10, 2005, the MCA provided that:

> **Motor Private Carrier.**-The term "motor private carrier" means a person, other than a motor carrier, transporting property by motor vehicle when--
>
> > (A) the transportation is as provided in section 13501 of this title;
> >
> > (B) the person is the owner, lessee, or bailee of the property being transported; and
> >
> > (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(13).

Additionally, the MCA stated that:

> The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier--
>
> > (1) between a place in --

> > (A) a State and a place in another state;
> >
> > (B) a State [*8] and another place in the same State through another State;
> >
> > (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
> >
> > (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
> >
> > (E) the United States and a place in a foreign country to the extent the transportation is in the United States; and

> in a reservation under the exclusive jurisdiction of the United States or on a public highway.

49 U.S.C. § 13501.

In sum, to be exempt from the FLSA overtime compensation provision as a motor private carrier prior to August 10, 2005, the employee must have been: (1) a person transporting property by motor vehicle; (2) engaged in activities affecting the safety of operation of motor vehicles; (3) engaged in interstate transportation; (4) an owner, lessee, or bailee of the property being transported; and (5) transporting property for sale, lease, rent, bailment or other commercial enterprise. *Kautsch v. Premier Commc'ns*, 502 F. Supp. 2d 1007, 1012 (W.D. Mo. 2007).

Here, it is undisputed that Plaintiffs transported property by motor vehicle, [*9] the cable boxes were under the control of individual drivers as bailees, and that the cable boxes were either sold or leased to customers. Therefore, the first, fourth, and fifth elements set forth in *Kautsch* are satisfied. However, the parties dispute whether Defendants' intrastate transportation can be characterized as interstate commerce, and whether the activities affect the safety of operations of motor vehicles.

### a. *Interstate Commerce*

Courts look to the product's "continuity of movement" across state lines to determine if purely intrastate activities are an extension of interstate commerce. *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993). This determination stems from the "essential character of the commerce," manifested in the "fixed and persisting transportation intent" of the shippers. *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997) (citation omitted) (affirming summary judgment of FLSA exemption for a local delivery driver who fulfilled specific customer orders intrastate through out-of-state vendors).

In evaluating whether a company intended to ship goods in interstate commerce when moving goods intrastate after remaining briefly in a storage [*10] facility, the court in *Musarra v. Digital Dish*, 454 F. Supp. 2d 692, 711-719 (S.D. Ohio 2006), utilized a seven-factor test contained in MC-207, a Department of Labor policy statement. This test includes: (1) the determination of the total volume to be shipped; (2) the amount of processing or product modification; (3) the shipper's control and direction of the goods; (4) the type of tracking system utilized; (5) whether the shipper bears the costs for transportation; (6) whether the shipper owns the warehouse; and (7) the existence of a "storage in transit" provision in the business agreement. *Id.*

In *Musarra*, the Digital Dish technicians retrieved equipment from one of DISH Network's Ohio warehouses and transported the materials to individual customers' homes, where the technicians then activated accounts and set-up satellite service. *Id.* at 695. The court found, despite the purely intrastate transportation of the equipment, that the seven factors weighed in favor of finding that DISH Network intended to ship goods interstate. *Id.* at 719; *see also Kautsch*, 502 F. Supp. 2d 1007 (utilizing the seven factors from MC-207 to find a satellite provider exempt from the FLSA overtime compensation [*11] provision). Here, for the reasons set forth below, the court also finds that the seven-factor test weighs in favor of finding that Cox intended to ship its cable equipment interstate.

### i. *Determination of Total Volume Shipped*

The first determination is whether the method employed by Cox when shipping its equipment out of state to Parma, Ohio, evidences an intent for the equipment to remain in interstate commerce until reaching customers. The strongest evidence of such an intent would be directly shipping product to the customer. However, another method is to show that goods are shipped based on an anticipation or understanding of customer needs. *See Guyton v. The Schwan Food Co.*, 125 Fed. Appx. 84, 2005 WL 280722 at *15 (8th Cir. 2005) (finding ship-

ment from out of state to temporary storage facility prior to intrastate delivery was one leg of an interstate journey, exempting the employees from coverage of the FLSA).

Here, it is undisputed that Cox determines the volume of product to ship to the Parma warehouse. Cox asserts that this determination flows from a specific formula of current customer demands, projections based on the current market, and other considerations which may increase [*12] or decrease the actual amount of cable equipment shipped. This court finds that Cox's method is similar to those used in *Guyton* and *Musarra*, where the courts found that using anticipated customer demands to determine shipping volume sufficiently satisfied the criterion. Accordingly, this factor weighs in favor of Defendants.

### ii. *Processing or Modification of the Product*

Modifying the product at the warehouse may be deemed the "manufacture of an item," which interrupts the stream of commerce and establishes a new commercial journey. *Roberts v. Levine*, 921 F.2d 804, 815 (8th Cir. 1990). When the product maintains its original state and merely continues to its destination after a short holding period, the interstate character has not been disrupted. In *Musarra*, 454 F. Supp. 2d at 716, DISH Network shipped satellite dishes to the Ohio warehouses, but the dishes required further assembly prior to installation in a customer's home. However, the court found that the "modifications to DISH Network products d[id] not rise to the level of the substantial processing that could interrupt a shipper's intent to move goods in interstate commerce." *Id.*

Here, Digital Cable does not modify the equipment [*13] after receipt from Cox. The equipment is programmed for two weeks and requires only that the technician deliver and activate the cable box by contacting Cox directly and transferring possession to the customer. The technician does not individually program the equipment without input from Cox. When a cable box or modem malfunctions, the Digital Cable technicians retrieve the equipment and return the product back to the warehouse, where it is shipped out of state for necessary repairs. Therefore, the fact that Digital Cable employees do not make modifications to or repair malfunctioning product, is even stronger evidence of the equipment's interstate character than that in *Musarra*, where the Digital Dish employees minimally modified the satellite dishes prior to installation. Accordingly, this factor weighs in favor of Defendants.

### iii. *Shipper's Control and Direction of the Goods*

If intrastate transportation is one leg of an interstate journey where the shipper intends to move a product to a customer, not simply to a warehouse, this would tend to

support a finding that transportation of product should be characterized as interstate commerce. In *Kautsch, 502 F. Supp. 2d at 1014*, DirecTV [*14] shipped products to a warehouse from out of state before completing installation at customers' homes through technicians of another company, Premier. The court found DirecTV exercised control over the product through constant tracking and by accessing information about the status of specific pieces of equipment. *Id.* Here, as in *Kautsch*, Cox maintains control of the product by determining when and where the technicians transport the equipment. As mentioned earlier, Cox does not ship directly to customers, but rather makes projections concerning the equipment needed in anticipation of customer demand and ships the equipment to the warehouse awaiting delivery. From the warehouse, Cox directly schedules orders from customers for the Digital Cable technicians to complete, using only the equipment sent to the Parma warehouse in anticipation of use in the Cleveland area. This relationship between Cox and Digital Cable indicates that Cox controls and directs the goods. Accordingly, this factor weighs in favor of Defendants.

### iv. The Type of Tracking System Utilized

A modern tracking system indicates a shipper's fixed and persisting intent to ship a product interstate by continually monitoring [*15] the location of the device and the demand of the product in a specific geographic area. Tracking that can be characterized as interstate ranges from merely tracking customer purchases to monitoring each piece of equipment through the use of complex scanning systems. *See Billings v. Frito-Lay Sales, LP, 413 F. Supp. 2d 817, 822 (S.D. Tex. 2006); Musarra, 454 F. Supp. 2d at 718.*

Here, the cable equipment is under constant supervision by Cox. Each piece of equipment contains a serial number that is scanned when possession of equipment changes. Equipment is scanned upon entering the warehouse, exiting the warehouse by technician transport, and leaving the technician's control upon lease by a customer. This process is reversed when a customer discontinues service or experiences problems with the equipment, requiring the equipment to be returned to Cox. Therefore, Cox's tracking system, which continually monitors the location of its equipment, indicates its fixed and persisting intent to ship the equipment interstate. Accordingly, this factor weighs in favor of Defendants.

### v. Bearing the Cost of Transportation

A shipper who bears the cost of transportation, through the final destination, demonstrates [*16] a fixed and persisting intent to ship products interstate. *Musarra, 454 F. Supp. 2d at 718.* Cox bears the original cost of transportation from out of state to the facility in Parma and also bears the cost when materials are shipped

out of state for repair. However, neither party presented concrete evidence concerning who bears the cost between the warehouse and customers' homes. Therefore, a thorough analysis of the "cost of transportation" element is not possible without this additional evidence. Accordingly, this factor does not weigh in favor of either party.

### vi. Ownership of the Warehouse

Cox owns the warehouse used to temporarily store cable equipment in Parma. This is further evidence in support of a finding that the shipment is more likely to be interstate commerce. The evidence here of the product's interstate character is stronger than that found in *Musarra* or *Kautsch*, as neither DISH Network, nor DirecTV owned the warehouses used as temporary storage in those cases. Accordingly, this factor weighs in favor of Defendants.

### vii. "Storage in Transit" Provision

Evidence that a storage in transit provision exists in the contract would be a factor that would weigh in favor of finding [*17] the shipment to be interstate. Here, neither party presents evidence regarding such a provision. However, *Musarra* noted that not having a "storage in transit" provision in a business agreement does not establish that the parties did not intend to transport equipment in interstate commerce. *454 F. Supp. 2d at 719.* In light of *Musarra*, the court here will give this factor only the slightest of weight in considering the interstate character of the shipment. Accordingly, for the reasons stated above, the court finds that Cox intended to ship its cable equipment interstate.

### b. Safety of Operation of Motor Vehicles Engaged in Interstate Commerce

Courts have consistently found that employees who engage in driving during their regular employment affect the safety of operation of motor vehicles. For example, in *Crooker v. Sexton Motors, Inc., 469 F.2d 206, 208 (1st Cir. 1978)*, the plaintiff was an employee who cleaned and polished cars but occasionally made interstate trips to deliver vehicles. The court stated that "it is obvious that one who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving," and therefore exempted the plaintiff [*18] from overtime compensation provided by the FLSA. *Id. at 209; see also O'Neal v. Kilbourne Med. Labs., Inc., No. 05-50, 2007 U.S. Dist. LEXIS 22620, 2007 WL 956428 (E.D. Ky. Mar. 28, 2007)* (holding that plaintiff phlebotomist was exempt from FLSA overtime compensation because it was necessary for her to drive to complete her employment duties).

Each Digital Cable technician drove a company vehicle to complete his or her normal employment duties. These employment duties included loading and trans-

porting cable boxes and modems from the Parma warehouse to the customer's home and retrieving the equipment from the customer's home in the event of cancellation of service or malfunction of equipment. As employees, technicians constantly drove vehicles, transporting goods which have been evaluated as having an essential interstate character. This is stronger evidence that this activity affects safety than that found in *Crooker*. It is similar to that of the employee in *O'Neal*. Therefore, the Digital Cable employees do affect safety and meet this element of 49 U.S.C. § 31502(b).

In summation, Defendants have presented undisputed evidence that Plaintiffs' technicians were: (1) persons transporting property by motor vehicle; [*19] (2) engaged in activities affecting the safety of operation of motor vehicles; (3) engaged in interstate transportation; (4) owners, lessees, or bailees of the property being transported; and (5) transporting property for sale, lease, rent, bailment or other commercial enterprise. Accordingly, this court finds that there is no genuine issue of material fact that Plaintiffs were exempt under the FLSA overtime compensation provision prior to the August 10, 2005 SAFETEA-LU Amendment. Whereas there are no genuine issues of material fact, the court concludes that judgment should be entered as a matter of law for Defendants on Plaintiffs' claims before August 10, 2005.

2. Digital Cable's Status Under the MCA After the August 10, 2005 SAFETEA-LU Amendment

The SAFETEA-LU Amendment, enacted on August 10, 2005, altered 49 U.S.C. § 13102 by changing "transporting property by motor vehicle" to "transporting property by commercial motor vehicle." "Commercial motor vehicle" is defined as follows:

(1) "commercial motor vehicle" means a self-propelled or towed vehicle used on highways in interstate commerce to transport passengers or property, if the vehicle

(A) weighs at least 10,001 pounds;

(B) is designed [*20] or used to transport more than eight passengers for compensation;

(C) is designed or used to transport more than fifteen passengers without compensation; or

(D) transports hazardous materials.

49 U.S.C. § 31132. (emphasis added).

The *Musarra* court, 454 F. Supp. 2d at 701, described the significance of the SAFETEA-LU Amendment as follows:

Before August 10, 2005, the FLSA's MCA exemption applied to most employees who drove any type and size of motor vehicle in interstate commerce. After the passage of SAFETEA-LU, however, vehicles that were previously exempt under the old definition of "motor vehicle" are no longer exempt because they are not "commercial motor vehicles."

The plain language of the SAFETEA-LU Amendment demonstrates that the terminology change cannot be, as Defendants contend, "inadvertent." This court, like *Kautsch* and *Musarra*, will apply the plain language to determine whether the exemption still applies after the SAFETEA-LU Amendment.

Here, Defendants did not produce evidence that the plaintiffs drove vans in excess of 10,001 pounds. Therefore, Defendants have not met their burden of demonstrating that no genuine issue of material fact exists regarding whether the vans are "commercial [*21] motor vehicles" and consequently whether the technicians for Digital Cable qualify as "motor private carriers" and are therefore exempt under the FLSA. Accordingly, since Defendants have not presented evidence demonstrating that the FLSA exemption applies after August 10, 2005, the court denies Defendants' Motion for Summary Judgment for claims after August 10, 2005.

**B. State Law Claims**

1. *Ohio Minimum Fair Wage Standard Law, Ohio Revised Code §§ 4111.01, et seq.*

Under O.R.C. § 4111.03(A), the OMFWSL states that:

an employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemption of section 7 and section 13 of the "Fair Labor Standards Act of 1938, 52

Stat. 1060, 29 U.S.C.A. 207, 213, as amended.

In _Trocheck v. Pellin Emergency Medical Services, Inc._, 61 F. Supp. 2d 685, 699-700 (N.D. Ohio 1999), the court found that the analysis of an FLSA claim applies equally to a claim brought under O.R.C § 4111.03(A). As stated above, Defendants have been found exempt from overtime compensation to their employees under the FLSA prior [*22] to the SAFETEA-LU Amendment, and the court's analysis therefore applies equally to Plaintiff's OMFWSL claim. Accordingly, the court grants Defendants' Motion for Summary Judgment regarding Plaintiffs' claims for overtime compensation prior to August 10, 2005 and denies Defendants' Motion for Summary Judgment on Plaintiffs' claims for overtime compensation after August 10, 2005.

### 2. Ohio Payment Law, Ohio Revised Code § 4113.15

The Ohio Payment Law provides that, where an employee due overtime compensation did not receive such payment within thirty days, the employer is liable for unpaid wages and liquidated damages "equal to six percent of the amount of the claim still unpaid and not in contest or disputed or two hundred dollars, whichever is greater." Ohio. Rev. Code § 4113.15. In _Wood v. Mid-America Management Corporation_, No. 1:04 CV 1633, 2005 U.S. Dist. LEXIS 37016, 2005 WL 1668503 at *9 (N.D. Ohio July 18, 2005), the court determined that the FLSA claim lacked merit and therefore granted the defendant's Motion for Summary Judgment on all claims, including violation of the OMFWSL and compensation pursuant to O.R.C. § 4113.15. Here, the court has concluded that Defendants are entitled to summary

judgment on Plaintiffs' [*23] FLSA and OMFWSL claim prior to August 10, 2005. Therefore, like the court in _Wood_, this court grants Defendants' Motion for Summary Judgment on Plaintiffs' claims for overtime compensation prior to August 10, 2005, and denies Defendants' Motion for Summary Judgment on Plaintiffs' claims for overtime compensation after August 10, 2005.

### IV. CONCLUSION

For the reasons stated above, the court grants Defendants' Motion for Summary Judgment for claims before August 10, 2005, and denies Defendants' Motion for Summary Judgment for claims after August 10, 2005. A final pretrial conference is hereby set on July 16, 2008, at 11:00 a.m. Trial shall commence on September 15, 2008, at 9:00 a.m. in Courtroom 17A. A separate trial order shall issue.

Prior to the final pretrial conference, the parties shall meet to determine if they can agree on whether the vehicles used by Plaintiffs in their employment weigh less than 10,001 pounds. Regardless of whether the parties agree to the weight of the vehicles, the court directs the parties to attempt to reach an agreement on what amount of overtime wages would be due to each Plaintiff on the assumption that Defendants are not exempt from the FLSA after August [*24] 10, 2005.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.

UNITED STATES DISTRICT JUDGE

June 11, 2008

LEXSEE



Positive
As of: Mar 11, 2013

JOSEPH L. CRAFT, DANIEL J. SMITH, RANDY L. HOWARD, KEVIN J. HOWARD, and JEREMY L. CHAMBERS, on behalf of themselves and on behalf of all other employees similarly situated, Plaintiffs, vs. RAY'S, LLC and DONALD MATTHEWS, Defendants.

1:08-cv-627-RLY-JMS

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION

2009 U.S. Dist. LEXIS 90862; 158 Lab. Cas. (CCH) P35,644

September 29, 2009, Decided
September 29, 2009, Filed

**SUBSEQUENT HISTORY:** Motion granted by Craft v. Ray's, LLC, 2010 U.S. Dist. LEXIS 2762 (S.D. Ind., Jan. 13, 2010)

**PRIOR HISTORY:** Craft v. Ray's, LLC, 2008 U.S. Dist. LEXIS 105807 (S.D. Ind., Dec. 31, 2008)

**CORE TERMS:** recyclable, driver, trash, interstate commerce, slinger, truck, shipment, out-of-state, continuity, summary judgment, container, state law claims, transported, recycling, empty, scrap, transfer stations, transportation, destination, metal, persisting, exemption, minute, recipients, wage claim, load, roll-off, processing, transport, delivery

**COUNSEL:** [*1] For CHRIS MCGUIRE, TIMOTHY MORTON, DANIEL J. SMITH, RANDY L. HOWARD, KEVIN J. HOWARD, JEREMY CHAMBERS, Plaintiffs: Andrew G. Jones, Philip J. Gibbons, Jr., GIBBONS JONES P.C., Indianapolis, IN.

For JOSEPH L. CRAFT, Plaintiff: Philip J. Gibbons, Jr., GIBBONS JONES P.C., Indianapolis, IN.

For RAY'S LLC, DONALD MATTHEWS, Defendants: Kim F. Ebert, Steven F. Pockrass, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, Indianapolis, IN.

**JUDGES:** RICHARD L. YOUNG, United States District Judge.

**OPINION BY:** RICHARD L. YOUNG

**OPINION**

**ENTRY ON DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

This matter is now before the court on Ray's, LLC ("Ray's") and Donald Matthews' ("Matthews") (collectively, "Defendants") motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment under Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motion is **GRANTED**.

**I. Background**

Joseph L. Craft ("Craft"), Daniel J. Smith ("Smith"), Randy L. Howard ("R. Howard"), Kevin J. Howard ("K. Howard"), and Jeremy L. Chambers ("Chambers") (collectively, "Plaintiffs") were all formerly employed by Ray's as either a driver or a driver's assistant (known [*2] as a "slinger"). Plaintiffs allege that Ray's has a policy of deducting a twenty minute lunch break from the time and pay of all drivers and slingers each shift, regardless of whether the individual employees actually take a twenty minute break. Plaintiffs further allege that pursuant to long-standing Department of Labor guidelines, break periods of twenty minutes or less must be

Page 1

2009 U.S. Dist. LEXIS 90862, *; 158 Lab. Cas. (CCH) P35,644

counted as compensable time worked. Accordingly, Plaintiffs claim that they, and those similarly situated to them, were not paid all wages (including overtime) earned by them, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the Indiana Wage Payment statute, IND. CODE § 22-2-5 et seq.

Although Defendants deny Plaintiffs' allegations, that denial is not the basis for the instant motion. Rather, Defendants contend that Plaintiffs fall under the Motor Carrier Act exemption to the FLSA's overtime requirements. As for Plaintiffs' state law claims, Defendants argue that those claims fail as a matter of law based upon Plaintiffs' own allegations and the designated evidence. Defendants also contend that the court lacks subject matter jurisdiction with respect to Craft's and Smith's [*3] state law claims.

### II. Facts [1]

> [1] Both parties' briefs contained an extensive statement of facts. As neither party disputes the facts presented by the other party, the court offers a summary of the facts pertinent to the present motion.

### A. Ray's and Related Companies

Ray's, a for-hire carrier, is a wholly owned subsidiary of Ray's Holdings, Inc. ("Ray's Holdings"). Ray's employs the drivers and slingers who transport trash and recyclables for Ray's Trash Service, Inc. ("Ray's Trash Service"), also a wholly owned subsidiary of Ray's Holdings. Ray's Trash Service provides recycling and waste disposal services to residential, commercial, and industrial customers in central Indiana. It also collects and sells recyclables (primarily paper, cardboard, ferrous and non-ferrous metals, glass, and plastic) to manufacturers of recycled products. Ray's Trash Service operates the White River Recycling and Transfer Station and the 334 Recycling and Transfer Station (collectively, the "transfer stations"), as well as the recycling facility known as Ray's Recycle. All of these facilities are located in Indiana.

### B. Plaintiffs' Job Duties

Plaintiffs were all employed by Ray's as either a roll-off truck driver, [*4] a rear-load truck driver, or a slinger. A roll-off truck is a vehicle used to transport containers that "roll off" the back of the truck. A rear-load truck is a vehicle in which the waste and recyclables are loaded into the rear of the truck and are then compacted. A slinger is normally assigned to each rear-load truck and is responsible for operating the blade used to compact the trash and recyclables. Ray's does not assign its drivers and slingers to a set route; rather, the

drivers and slingers receive assignments from a daily log sheet and from the dispatchers.

Drivers and slingers are responsible for transporting empty containers to customer locations and then picking up the containers once they are full of recyclables and/or trash. Some containers are dedicated for a specific type of recyclable (such as paper or cardboard), while other containers may be filled with any and all types of waste. Once a full container is picked up, it is taken to either Ray's Recycle or one of the transfer stations.

### C. The Recycling Process

Containers which contain a mixture of trash and recyclables are unloaded onto a large concrete floor so that Ray's Trash Service employees can sort through the waste [*5] and separate any recyclables from the trash. Oftentimes, several containers from different drivers are commingled and sorted at one time. After the waste has been sorted, any trash is transported by a Ray's driver to an instate landfill or incinerator, while the recyclables are weighed, inspected for quality, and consolidated with like materials. The recyclables are then shredded, compacted, or baled in preparation for delivery to the end recipients.

Containers dedicated for a specific type of recyclable are also inspected by Ray's Trash Service employees for quality control purposes. Any items not meeting quality thresholds are removed. The remaining recyclables are then shredded, compacted, or baled in preparation for delivery to the end recipients.

Scrap metal is the only recyclable which is not processed by Ray's Recycle or one of the transfer stations. Any scrap metal discovered at these locations is transported by a Ray's driver to Farnsworth Metals, Inc. ("Farnsworth"). Farnsworth is a metal recycling facility located in Indiana and owned by Matthews. Matthews is also the majority shareholder of Ray's Holdings. Once at Farnsworth, scrap metal is unloaded onto a large concrete [*6] floor, at which time Farnsworth employees assess and grade the load. Metals within the load are then segregated by type of metal, as well as various sub-grades within each type of metal.

The transfer stations, Ray's Recycle, and Farnsworth do not know exactly what type of materials are being transported by the Ray's drivers and slingers until the loads arrive at a facility and can be identified, assessed, and graded by facility personnel. Typically, this process is completed and the items are shipped out within 48 hours. Ray's Recycle, the transfer stations, and Farnsworth do not have the capacity to engage in extended storage of materials, so they enter into advance agreements and arrange advance scheduling whenever possible. In most cases, the end recipients purchase orders and

2009 U.S. Dist. LEXIS 90862, *; 158 Lab. Cas. (CCH) P35,644

assign release numbers for each shipment for the up-coming month. In other words, the mill buyers state in advance what they will pay for certain materials during the upcoming month and provide a set of release num-bers to be used for the shipments of those materials.

Facility personnel schedule outbound shipments of materials in anticipation of full truckload quantities or else when full truckload quantities [*7] are accumulat-ed. Bills of lading are then created with material type, destination, seller, buyer, transporter, date, weights, and purchase orders/release numbers. Ray's Recycle, the transfer stations, and Farnsworth keep extra trailers on site for various customers and will directly load those trailers as soon as items are baled to facilitate the con-tinuous outbound flow of recyclables.

Selling recyclables to end recipients comprises ap-proximately ten percent of Ray's Trash Service's annual revenue and nearly all of Farnsworth's annual revenue. Well over fifty percent of the recyclables sold by Ray's Trash Service and Farnsworth are shipped to out-of-state recipients. For example, one of Ray's Trash Service's major purchasers of cardboard is Weyerhaeuser, which directs shipments to locations in Michigan, Kentucky, and Iowa. Ray's Trash Service and Farnsworth ship thousands of tons of recyclables out-of-state every year. The Ray's drivers and slingers do not transport any recy-clables to out-of-state recipients.

**D. Plaintiffs' Employment Histories**

Craft was employed by Ray's as a driver of a roll-off truck from approximately July 25, 2007, to April 30, 2008. Craft was involuntarily discharged [*8] from Ray's.

Smith was employed by Ray's as a driver of a roll-off truck from November 27, 2006, to February 18, 2008. Smith was involuntarily discharged from Ray's.

R. Howard first became employed by Ray's in Janu-ary 1999. Three years prior to his joining the instant lawsuit as a named Plaintiff, R. Howard was a driver assigned to the delivery division. In that position, he drove large flat-bed delivery trucks, rear-load trucks, and roll-off trucks, and he had to be available to drive any of these types of trucks on any given day. On or about Au-gust 10, 2006, R. Howard became a driver in the roll-off truck division, and continued as a roll-off truck driver until he voluntarily quit his employment on or about July 25, 2008.

K. Howard was employed by Ray's from September 21, 2005, to January 18, 2008. From the beginning of his employment to June 17, 2007, K. Howard worked in the paint shop. In that position, he would have been needed on a regular basis to perform slinger duties. From June 18, 2007, to the end of his employment, K. Howard worked as a second-shift mechanic. K. Howard voluntar-ily quit his employment with Ray's.

Chambers worked as a slinger throughout his em-ployment with Ray's. [*9] He was employed by Ray's from December 6, 2006, until he voluntarily quit his em-ployment on or about June 8, 2008.

Each week, the drivers and slingers employed by Ray's sign time cards, which are used to calculate their pay. All of the Plaintiffs signed time cards showing the specific number of hours for which they would be paid each week. Daily totals, based on clock-in and clock-out times, minus twenty minutes for lunch, are shown on the time cards. The gross numbers of hours worked per day reflects the twenty minute deduction, and each of the Plaintiffs was paid in accordance with what was shown on the time card that they signed.

During their employment, none of the Plaintiffs ever complained to Valerie Abernathy, the Human Resources manager, that they had ever skipped a lunch break and therefore should have been paid more than what they were paid. Ray's has never received notice that any of the Plaintiffs filed a wage claim with the Indiana Department of Labor. Ray's has never received notice that any wage claim has been assigned or referred by the Commissioner of Labor or the Indiana Attorney General to a private attorney.

**III. Standard of Review**

Defendants move for the dismissal [*10] of Plain-tiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). However, if matters outside the pleadings are presented in support of a mo-tion under Rule 12(b)(6), the court must treat the motion as one for summary judgment. FED. R. CIV. P. 12(d). As Defendants go well beyond the pleadings in support-ing their motion, the court will consider the present mo-tion as one for summary judgment, rather than dismissal.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The non-moving party, however, may not rest on mere allegations or de-nials in its pleadings, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Lib-erty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91

L. Ed. 2d 202 (1986). Factual disputes that are [*11] irrelevant or unnecessary to the claims before the court will not alone defeat a summary judgment motion. *Id.* at 247-48. When determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

## IV. Count One-FLSA

The FLSA requires employers to pay employees one and one-half times their normal hourly wage for each hour they work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). However, the overtime provisions of the FLSA do not apply to employees over whom "the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [49 U.S.C. § 13502]." 29 U.S.C. § 213(b)(1). This exemption, commonly referred to as the Motor Carrier Act ("MCA") exemption, applies:

> to those employees . . . whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) [a]s that of a driver, driver's helper, loader, or mechanic, and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in [*12] interstate or foreign commerce within the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2(b)(2). Exemptions to the FLSA "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960) (citing *Mitchell v. Lubin, McGaughy, & Assoc.*, 358 U.S. 207, 211, 79 S. Ct. 260, 3 L. Ed. 2d 243 (1959)).

In the instant case, Plaintiffs do not dispute that they were employed as drivers and loaders and that, as such, they affected the safety of operation of motor vehicles on the public highways. Accordingly, the court need only to determine whether Plaintiffs participated in interstate commerce within the scope of their employment with Ray's. In order to meet the "interstate commerce" requirement of the MCA exemption, a driver need not transport goods in interstate commerce every shift. *See* 46 Fed. Reg. 37,902 (July 23, 1981). Rather, the pertinent inquiry is whether the driver in question "is, or could be, called upon to transport a shipment in interstate commerce." *Id.* It is also not necessary for a driver to

actually cross state lines. Transportation of [*13] goods within a single state is interstate in character where it forms part of a "practical continuity of movement" across state lines from the point of origin to the point of destination. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568, 63 S. Ct. 332, 87 L. Ed. 460 (1943); 29 C.F.R. § 782.7(b)(1).

A crucial factor when considering whether the transported goods are part of a practical continuity of movement in interstate commerce is the "original and persisting intention of the shippers." *Baltimore & O.S.W.R.R. v. Settle*, 260 U.S. 166, 173-74, 43 S. Ct. 28, 67 L. Ed. 189 (1922); 29 C.F.R. § 782.7(b) (intrastate transportation can satisfy the interstate commerce requirement of the MCA exemption if the shipper has a "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment."). The determination as to whether transportation performed within a single state is interstate in character must be based on the totality of the circumstances. *See Atlantic Coast Line R.R. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 268-69, 48 S. Ct. 107, 72 L. Ed. 270 (1927).

Defendants contend that Plaintiffs did participate in interstate commerce because over fifty percent of the recyclables they transported were later shipped to out-of-state recipients, [*14] generally within 48 hours. Plaintiffs, however, contend that they did not participate in interstate commerce because there was an interruption in the practical continuity of movement of the recyclables in interstate commerce and because Ray's Trash Service and Farnsworth did not have a fixed and persisting intent to ship the recyclables out-of-state. [2] The court addresses each issue raised by Plaintiffs in turn below.

> 2   Plaintiffs do not argue that they did not engage in interstate commerce because the recyclables were shipped out-of-state by Ray's Trash Service and Farnsworth, rather than Ray's. As all three companies are related and do not seem to operate at arm's length, the court will consider Plaintiffs to be involved with the activities of Ray's Trash Service and Farnsworth.

## A. Practical Continuity of Movement in Interstate Commerce

Prior to being shipped out-of-state, the recyclables transported by the Ray's drivers and slingers are inspected for quality, consolidated with like materials, and shredded, compacted, and/or baled. Plaintiffs contend that this "processing" sufficiently interrupts the practical continuity of movement in interstate commerce. To support their position, [*15] Plaintiffs cite to *Alice v. GCS, Inc.*, 2006 U.S. Dist. LEXIS 65498, 2006 WL 2644958 (N.D. Ill. Sept. 14, 2006), a case in which the district

2009 U.S. Dist. LEXIS 90862, *; 158 Lab. Cas. (CCH) P35,644

court held that the separating, sorting, and commingling of waste prior to shipping it across state lines sufficiently interrupted the continuity of movement.

The rulings by federal district courts are not binding in other cases or on other district court judges, even within the same circuit. *TMF Tool Co., Inc. v. Muller*, 913 F.2d 1185, 1191 (7th Cir. 1990). Accordingly, the court declines to follow the holding of *Alice*. The district court reached its holding by analogizing the case before it to *Goldberg v. Faber Indus. Ind.*, 291 F.2d 232 (7th Cir. 1961). The court, however, does not believe that *Goldberg* is dispositive on the question of whether sorting, separating, and commingling waste sufficiently interrupts the practical continuity of movement.

The plaintiffs in *Goldberg* were employed by the defendant as "scrap drivers." 291 F.2d at 234. The plaintiffs' job duties entailed purchasing meat scraps from butchers, restaurants, and packing plants, and then transporting the meat scraps to the defendant's rendering plants. *Id.* There, the meats scraps were processed into grease, [*16] animal foods, and other products. *Id.* Based on these facts, the Seventh Circuit held that this processing was "sufficient to break the continuity of the transportation, thus precluding a holding that there is a through interstate movement of the meat scraps." *Id.* The court cannot agree with the conclusion of the district court in *Alice* that separating, sorting, and commingling of waste and recyclables is comparable to rendering meat scraps into grease, animal foods, and other products. In *Goldberg*, the meat scraps transported by the plaintiffs underwent significant processing and were transformed into entirely new products before being shipped out-of-state. Separating, sorting, and commingling waste and recyclables does not create a new good.

As *Goldberg* is the only case in which the Seventh Circuit addresses the practical continuity of movement in interstate commerce, the court must look to other sources for guidance. In *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217 (2d Cir. 2002), the Second Circuit resolved a case very similar to the instant case. In *Bilyou*, the plaintiffs worked as delivery drivers for Dutchess Beer Distributors, Inc. ("DBD"), a wholesale beverage distributor [*17] with a processing plant in Poughkeepsie, New York and a warehouse in Kingston, New York. *Id.* at 219. The plaintiffs loaded their trucks at DBD's New York facilities and delivered the products to customers located solely within the state of New York. *Id.* at 220. Upon making deliveries, the plaintiffs collected empty product containers ("empties") from the customers, which included aluminum cans, glass and plastic containers, and returnable or refillable containers such as empty barrels, bottles, and pallets. *Id.* The plaintiffs returned the empties to either the Kingston warehouse or to

a recycling center operated by Mid-Hudson Aluminum Can Recycling, Inc. ("Mid-Hudson"). *Id.* at 219-20.

The Mid-Hudson recycling center was located on the same parcel of land as the DBD processing plant in Poughkeepsie, was owned by the owners of DBD, and processed exclusively DBD products. *Id.* at 219. Mid-Hudson would purchase the glass empties from DBD, crush them, and then sell them to different suppliers in Connecticut and Pennsylvania, with shipments going out approximately three times a week. *Id.* at 220. Mid-Hudson would also purchase the aluminum empties from DBD, crush them, and sell them to suppliers [*18] in Connecticut, with shipments going out approximately three times per month. *Id.* Aluminum empties taken to the Kingston warehouse were flattened and loaded onto a trailer to be picked up by Reynolds Aluminum, which would purchase the processed aluminum empties from DBD and take them to a recycling plant in Connecticut. *Id.* at 221. The Court found that although the plaintiffs' carriage of the empties took place entirely within the state of New York, their carriage was merely one leg of a route to an out-of-state destination. *Id.* at 224. Accordingly, the Court held that plaintiffs were part of the practical continuity of movement of goods in interstate commerce and that, therefore, the MCA exemption did apply. *Id.*

Although *Bilyou* is not binding on the court, the court finds it persuasive, especially as it is consistent with policy review statements put forth by the Interstate Commerce Commission ("ICC"). In its 1992 policy statement, the ICC addressed the issue of whether goods, temporarily stored in a warehouse or distribution center before moving to their final destination, move in interstate commerce. 1992 Policy Statement, Ex Parte No. MC-207, 8 I.C.C. 2d 470, 1992 WL 122949 (May 8, 1992). [*19] In this statement, the ICC notes that goods may be repackaged or reconfigured while at the warehouse without interrupting the practical continuity of movement in interstate commerce, while processing or substantial product modification may constitute an interruption. 8 I.C.C. 2d 470, *Id.* at *2. The recyclables at issue in the instant case were inspected, consolidated, and baled while temporarily stored at either Ray's Recycle, one of the transfer stations, or Farnsworth. The court believes that these activities fall within the categories of repackaging and reconfiguring, and therefore, do not interrupt the practical continuity of movement in interstate commerce.

## B. Fixed and Persisting Intent

Intent "is determined by reference to the intended final destination of the shipment as that intent existed when the shipment commenced." *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74 (2d Cir. 2001). The original

2:13-cv-10353-AJT-MKM   Doc # 17-6   Filed 03/11/13   Pg 25 of 58   Pg ID 133

2009 U.S. Dist. LEXIS 90862, *; 158 Lab. Cas. (CCH) P35,644

intention "fixes the character of the shipment for all the legs of the transport within the United States. . . . Thus, if the final intended destination is another state, the [MCA] applies throughout the shipment, even as to a carrier that is only responsible for any intrastate [*20] leg of the shipment." *Id.* at 74.

Plaintiffs argue that there is no fixed and persisting intent to ship the recyclables in interstate commerce because the ultimate destination of any given load of recyclables is unknown at the time it is transported by the Ray's drivers and slingers. The ICC, however, has noted that lack of knowledge as to the specific, ultimate destination of a good at the time shipment begins is not sufficient to establish that the shipper lacked a fixed and persistent intent to engage in interstate commerce. 1992 Policy Statement, 8 I.C.C. 2d 470, 1992 WL 122949, at *5-6. Fixed and persisting intent may be established if the shipper has a factual basis for projecting out-of-state sales, rather than a mere plan to solicit sales out-of-state. 8 I.C.C. 2d 470, *Id.* at *4.

In the instant case, Ray's Trash Service and Farnsworth did not have a "mere plan" to solicit sales out-of-state. Well over fifty percent of the recyclables sold by Ray's Trash Service and Farnsworth are sold to out-of-state recipients. In most cases, purchase agreements are executed in advance on a monthly basis. Although Ray's Trash Service and Farnsworth do not know in advance the ultimate destination of specific loads of recyclables [*21] transported by the Ray's drivers and slingers, they do know that a large portion of each load will ultimately go out-of-state. Accordingly, the court finds that Ray's Trash Service and Farnsworth have a fixed and persisting intent to ship a majority of the recyclables transported by the Ray's drivers and slingers in interstate commerce.

Although Plaintiffs never transported the recyclables across state lines, the court finds that their transportation was part of a practical continuity of movement across state lines, with Ray's Trash Service and Farnsworth having a fixed and persisting intent to ship the recyclables in interstate commerce at the time transportation began. Accordingly, Plaintiffs did participate in interstate commerce within the scope of their employment with Ray's, which puts them within the MCA exemption to the FLSA. Defendants are entitled to summary judgment on Plaintiffs' FLSA claims as a matter of law.

**V. Count Two-State Law Claims**

A. Supplemental Jurisdiction Having granted summary judgment in favor of Defendants on the FLSA claims, the court must decide whether to retain supplemental jurisdiction over the remaining state law claims. A district court may retain supplemental [*22] jurisdiction over state law claims even after it has dismissed all

claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The court is given broad discretion in determining whether it is appropriate to retain jurisdiction over the state law claims. *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 728 (7th Cir. 1998) (citing *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1250 (7th Cir. 1994)).

As a general rule, "when all federal law claims are dismissed before trial, the pendent claims should be left to the state courts. . . . A district court should have a good reason for retaining jurisdiction and therefore should make a finding as to the balance of judicial economy, convenience, fairness and comity to justify retention." *Wright*, 29 F.3d at 1252. It is appropriate for the court to retain jurisdiction over state law claims when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." *Id.* Federal retention of state law claims is also appropriate where it is obvious how the state law claims should be decided. *Id.* at 1251-52.

The instant action has been pending [*23] in this court for over a year. The parties have already engaged in extensive discovery and the state law claims have been fully briefed. Remanding to state court would be a waste of judicial resources. Furthermore, the court believes that it is obvious how Plaintiffs' state law claims should be decided. Accordingly, the court elects to retain pendent jurisdiction.

**B. Indiana Code 22-2-5-1**

Plaintiffs assert state law claims for violation of the Indiana Wage Payment statute, which provides that Indiana employers "shall pay each employee at least semimonthly or biweekly, if requested, the amount due to the employee." IND. CODE § 22-2-5-1(a). An employer who violates this requirement is liable for the amount due, plus up to twice that amount in liquidated damages. IND. CODE § 22-2-5-2. In support of their motion for summary judgment on these claims, Defendants argue that: (1) Plaintiffs Craft and Smith cannot bring claims under the Wage Payment statute; (2) Plaintiffs signed timecards reflecting the twenty minute deductions; (3) Plaintiffs' Wage Payment Statute claims are preempted by the FLSA. The court addresses each of these arguments in turn below.

**1. Plaintiffs Craft and Smith**

The Wage [*24] Payment statute references current employees and employees who have voluntarily left employment. IND. CODE § 22-2-5-1(b). By contrast, the Wage Claims statute references employees who have been terminated by their employer. IND. CODE §

2:13-cv-10353-AJT-MKM    Doc # 17-6    Filed 03/11/13    Pg 26 of 58    Pg ID 134

2009 U.S. Dist. LEXIS 90862, *; 158 Lab. Cas. (CCH) P35,644

22-2-9-2(a)(b). As it is undisputed that Craft and Smith were terminated by Ray's, they can proceed under the Wage Claims statute only. *Shelton v. Family Dollar Stores of Ind., LP*, 2007 U.S. Dist. LEXIS 40518, 2007 WL 1597650, at * 10 (S.D. Ind. June 1, 2007). Craft and Smith have not pled a claim under the Wage Claims statute. In fact, claimants who proceed under the Wage Claims statute may not file a complaint in trial court, but rather must submit a claim with the Indiana Department of Labor. *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind. 2002). Accordingly, Defendants will be granted summary judgment on Craft's and Smith's claims under the Wage Payment statute.

## 2. Timecards

"The Wage Payment statute is a penal statute which, being in derogation of the common law, must be strictly construed." *E & L Rental Equip., Inc. v. Bresland*, 782 N.E.2d 1068, 1070 (Ind. Ct. App. 2003) (citing *Huff v. Biomet, Inc.*, 654 N.E.2d 830, 835 (Ind. Ct. App. 1995)). [*25] A plaintiff cannot recover under the Wage Payment statute unless he, by averment and proof, brings himself clearly within the terms of the statute. *Flex Let Corp. v. Vogel*, 134 Ind. App. 495, 186 N.E.2d 696, 698 (Ind. Ct. App. 1963) (citing *Standard Liquors, Inc v. Narcowich*, 121 Ind. App. 600, 99 N.E.2d 268, 270 (Ind. Ct. App. 1951). In order to fall within the purview of the statute, a plaintiff must request that his employer pay the disputed wages. *Id.* Such request "must be directly related to the contract of employment and must be concurrent with, if not prior to, the period of employment." *Id.*

In the instant case, Plaintiffs do not allege that they ever made a request to be paid for the twenty minutes Defendants deducted from their payable hours each day. Plaintiffs do not dispute that they signed the timecards reflecting the twenty minute deductions and were paid according to the signed timecards. Accordingly, there is no genuine issue of material fact and Defendants are entitled to summary judgment as a matter of law.

## 3. Federal Preemption

Defendants argue that the FLSA is the exclusive remedy for Plaintiffs' unpaid wage claims. Plaintiffs, however, argue that there are certain circumstances where the FLSA would not  [*26] apply, allowing them to proceed under state law. As the court finds that Plaintiffs' Wage Payment statute claims are barred under the plain language of the statute, it need not address the issue of preemption.

## VI. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss or, Alternatively for Summary Judgment (Docket # 39) is **GRANTED**.

**SO ORDERED** this 29th day of September 2009.

/s/ Richard L. Young

RICHARD L. YOUNG, JUDGE

United States District Court

Southern District of Indiana

LEXSEE



Positive
As of: Mar 11, 2013

GARY DALTON, DWIGHT COVINGTON, LADONNA GEORGE, and MARK
RITCHIE, on behalf of themselves and all persons similarly situated, Plaintiffs, v.
SABO, INC., ROBERT A. HILL, and SALLY A. HILL, Defendants.

Civ. No. 09-358-AA

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON

2010 U.S. Dist. LEXIS 32472

April 1, 2010, Decided
April 1, 2010, Filed

**CORE TERMS:** pound, driver, motor vehicles, carrier, exemption, route, overtime, weighing, transportation, supervisor, genuine, rating, weighed, exempt, light duty, interstate commerce, trucks, overtime wages, summary judgment, vehicle driven, driving, drove, Motor Carrier Act, declaration, non-moving, assigned, highways, vending, machines, Fair Labor Standards Act

**COUNSEL:** [*1] For Gary Dalton, on behalf of himself and all others similarly situated, Dwight Covington, on behalf of himself and all others similarly situated, Ladonna George, on behalf of herself and all others similarly situated, Mark Ritchie, on behalf of himself and all others similarly situated, Plaintiffs: Don S. Willner, LEAD ATTORNEY, Don S. Willner & Associates, PC, Trout Lake, WA; Marty Durand, LEAD ATTORNEY, PRO HAC VICE, Herzfelt & Piotrowski, LLP, Boise, ID; James M. Piotrowski, PRO HAC VICE, Herzfeld & Piotrowski, L.L.P., Boise, ID.

For Sabo, Inc., Robert A. Hill, Sally A. Hill, Defendants: Amanda T. Gamblin, Thomas M. Triplett, LEAD ATTORNEYS, Schwabe, Williamson & Wyatt PC, Portland, OR; Sharon E. Rye, LEAD ATTORNEY, Schwabe Williamson & Wyatt, Portland, OR.

**JUDGES:** Ann Aiken, United States District Judge.

**OPINION BY:** Ann Aiken

**OPINION**

OPINION AND ORDER

AIKEN, Chief Judge:

Plaintiffs filed suit alleging violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), based on defendants' failure to pay overtime compensation. Defendants move for summary-judgment against claims raised by plaintiffs Covington, George, and Ritchie on grounds that they are exempt from FLSA overtime requirements under the Motor [*2] Carrier Act. Defendants also move for summary judgment against plaintiff Dalton's claims, arguing that while he is entitled to overtime wages, defendants have paid him in full. For the reasons set forth below, defendants' motion is granted, with the exception of an eight-week period during which plaintiff George was on light duty.

BACKGROUND

Defendant Sabo, Inc. (Sabo), doing business as Hoodview Vending, is a company operated by defendants Sally and Bob Hill, with its principle offices located in Tualatin, Oregon. Sabo owns and maintains vending machines located across northwestern Oregon and southwestern Washington.

Plaintiffs Covington, Ritchie, and George were route drivers for Sabo. They drove trucks loaded with items such as packaged snacks, condiments, fresh and frozen food, soda, coffee, bottled water, utensils and the like and delivered them to Sabo's vending machines in Oregon and Washington.

In May 2007, George was promoted to Route Supervisor, a position she maintained until November 2009. In this capacity, George scheduled and trained new drivers on different routes, conducted route audits, issued memoranda on driver performance, filled in for drivers who were ill or on vacation, [*3] and recommended drivers for hire. Approximately 75 percent of George's route supervisor duties involved training new drivers. From November 2008 to January 2009, George was assigned to light duty after an employment-related injury, and she performed receptionist and other clerical office duties.

Plaintiff Dalton was a technician. Dalton drove a repair van and performed maintenance and repairs on Sabo's machines.

According to defendants' submissions, Sabo owns at least nine delivery vehicles, four with gross vehicle weight (GVW) ratings in excess of 10,000 pounds and five with GVW ratings of 10,000 pounds. Defendants assert that three vehicles with ratings of 10,000 pounds were retrofitted to carry more than 10,000 pounds. Defendants also submitted evidence that the majority of trucks driven by plaintiffs actually weigh more than 10,000 pounds. According to defendants, plaintiffs were responsible for driving any Sabo vehicle at any given time, given scheduling or maintenance issues.

On April 7, 2009, plaintiffs filed suit under the FLSA alleging that defendants failed to pay required overtime compensation during weeks each plaintiff worked more than forty hours. Plaintiffs seek unpaid [*4] overtime wages, liquidated damages, costs, and attorney fees.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202, (1986). A factual dispute is "material" when it could affect the outcome of the case under the governing law. Id.

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party shows the absence of genuine issues of material fact, the nonmoving party must go beyond the pleadings and identify specific facts which show a genuine issue for trial. Id. at 324. Summary judgment is thus appropriate when the

non-moving party fails to present evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of [*5] proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56(c), the court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. However, the Ninth Circuit has refused to find a genuine issue of fact where the only evidence presented is "uncorroborated and self-serving" testimony. Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996).

## DISCUSSION

Under the FLSA, employers are required to compensate employees at the rate of one and one-half of their regular hourly rate when employees work more than forty hours in a given work week. 29 U.S.C. § 207(a). However, the FLSA exempts from overtime requirements "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the Motor Carrier Act (MCA). Id. § 213(b)(1).

The "fundamental test" for determining whether the MCA exemption applies is whether "the employee's activities affect safety of operation" of motor vehicles and are therefore within the jurisdiction of the Secretary of Transportation. Levinson v. Spector Motor Serv., 330 U.S. 649, 671, 67 S. Ct. 931, 91 L. Ed. 1158 (1947). [*6] Generally, "[t]he duties of drivers affect safety of operation, so drivers employed by motor carriers covered by the Motor Carrier Act are subject exclusively to the authority of the Secretary of Transportation." Mayan v. Rydbom Exp., Inc., 2009 U.S. Dist. LEXIS 90525, 2009 WL 3152136 *3 (E.D. Pa. Sept. 30, 2009) (citing Levinson, 330 U.S. at 664-65) . Defendants contend that Covington, George, and Ritchie are exempt from FLSA overtime requirements under the MCA, because their employment duties affected the safety of Sabo's motor vehicle operations.

Before August 2005, a "motor carrier" was defined as a "person providing motor vehicle transportation for compensation," and the MCA exemption "applied to all drivers operating in interstate commerce, regardless of the weight of the vehicle driven." Glanville v. Dupar, Inc., 2009 U.S. Dist. LEXIS 88408, 2009 WL 3255292 *4 (S.D. Tex. Sept. 25, 2009) (citing 49 U.S.C. § 13102 (2002)). Therefore, prior to August 2005, Sabo was a motor carrier and the MCA exemption applied to its drivers.

On August 10, 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. No.

109-59. This act amended the term "motor carrier" to mean "a person  [*7] providing commercial motor vehicle . . . transportation for compensation." 49 U.S.C. 13102(14) (2005). Under the MCA, "commercial motor vehicle" is defined, in pertinent part, as:

> [A] self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle--

> > (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater; . . .

49 U.S.C. § 31132(1). Consequently, those persons or entities who did not operate "commercial" motor vehicles, i.e., those with a GVW rating or actual weight exceeding 10,000 pounds, were not considered "motor carriers" under the MCA and their employees were not exempt from FLSA overtime requirements.

On June 6, 2008, Congress passed the SAFE-TEA-LU Technical Corrections Act of 2008, Pub. L. 110-244 (2008) . This Act restored the previous definition of "motor carrier" by replacing "commercial motor vehicle" with "motor vehicle." Id. § 305(c); 49 U.S.C § 13102(14). However, the Act retained FLSA overtime protection for any "covered employee," defined as an individual:

> (1) who is employed by a motor carrier or motor private carrier . . .

> (2) whose work, in whole or in  [*8] part, is defined--

> > (A) as that of a driver, driver's helper, loader, or mechanic; and

> > (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce .... [and]

> > (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

Id. § 306(a) and (c); see also Note to 29 U.S.C. § 207. In other words, FLSA overtime requirements apply to motor carrier employees whose employment duties involve the safety of motor vehicles weighing 10,000 pounds or less. Thus, to establish the applicability of the MCA exemption after August 10, 2005, defendants must show that Sabo is a motor carrier under the MCA and that the employment duties of Covington, Ritchie and George involved the safety of motor vehicles weighing more than 10,000 pounds in interstate commerce.

I find that Sabo meets the definition of "motor carrier" after enactment of the SAFETEA-LU Act and the SAFETEA-LU Corrections Act. Sabo provides motor vehicle transportation, including motor vehicles exceeding 10,000 pounds, for compensation in interstate commerce. Similarly, the employment duties of Covington, Ritchie, and George -- either as  [*9] drivers or route supervisor -- involved motor vehicles transporting goods on public highways in interstate commerce, thus affecting the safety of operations. See Robert Hill Decl., Ex. 19-25; Gamblin Decl., Exs. 2-4; George Suppl. Decl. (stating that she either drove or rode in Sabo's trucks while training drivers) . Finally, I find that defendants produce competent and unrebutted evidence that the vehicles driven by Covington, Ritchie, and George either had gross vehicle weight ratings in excess of 10,000 or actually weighed in excess of 10,000 pounds. See Dubois Decl., Exs. 21-22; Robert Hill Decl.; Robert Hill Suppl. Decl., Exs. 34-35. [1] Therefore, Covington, Ritchie, and George were exempt from the overtime requirements of the FLSA while performing their duties as drivers and route supervisor. See 29 C.F.R. § 782.2(a) (exemption depends both on class to which employer belongs and class of work involved in employee's job).

> 1    Two vehicles driven by George actually weighed less than 10,000 pounds. However, the GVW rating exceeded 10,000 pounds, and for the reasons explained infra, the fact that George occasionally drove vehicles weighing 10,000 pounds or less does not alter my analysis  [*10] or resolution of the parties' motions.

Plaintiffs nonetheless contend that defendants fail to meet their burden of establishing applicability of the MCA exemption, because the evidence presented does not prove that the vehicles driven by Covington, George, or Ritchie actually weighed more than 10,000 pounds during each work week at issue. Plaintiffs produce declarations from Covington and Ritchie asserting that they could tell how much their vehicles weighed by how the

vehicle "felt" while driving them, and that their vehicles never weighed more than 10,000 pounds. See Covington Decl., PP 4-8; Ritchie Decl., PP4-8.

I am not persuaded and do not find plaintiffs' declarations to be competent evidence of the vehicles' weight absent evidentiary support. Notably, plaintiffs present no other evidence regarding the actual weight of the vehicles and do not argue or suggest they were prevented from obtaining such evidence from defendants. Given that defendants' evidence is not rebutted by "specific facts" as required by Rule 56(c), I find that Covington, Ritchie and George performed duties on vehicles weighing more than 10,000 pounds.

Regardless, even if each of these plaintiffs occasionally performed   [*11]   duties on vehicles weighing 10,000 pounds or less, "when mixed activities occur, the Motor Carrier Act favors coverage of the employee during the course of employment." Hernandez v. Brink's, Inc., 2009 U.S. Dist. LEXIS 2726, 2009 WL 113406 *6 (S.D. Fla. Jan. 15, 2009). Indeed, applicable regulations provide that:

> [I]f the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers, driver's helpers . . . that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities ... he comes within the exemption in all workweeks when he is employed at such job.

29 C.F.R. § 782.2(b) (3). In other words, if Covington, George, or Ritchie performed or were expected to perform duties on vehicles weighing in excess of 10,000 pounds in the normal course of their duties as drivers or route supervisor, the MCA exemption applies. Defendants present uncontested evidence that Sabo drivers were expected to drive any Sabo vehicle at any given time.

Moreover, I agree with defendants that:

> Dividing jurisdiction over the same drivers, with the result that their employer would be regulated   [*12]   under the Motor Carrier Act when they were driving the big trucks and under the Fair Labor Standards Act when they were driving trucks that might weigh only a pound less, would require burdensome record-keeping, create confusion, and give rise to mistakes and disputes.

Collins v. Heritage Wine Cellars, Ltd., 589 F.3d 895, 901 (7th Cir. 2009). Accordingly, I find that the employment duties of Covington, Ritchie and George as drivers and route supervisor involved motor vehicles that weighed 10,001 pounds or more, thus affecting the safety of operations within the meaning of the MCA exemption.

The only exception I find is with respect to George's employment duties while she was assigned to light duty from November 29, 2008 to January 27, 2009. Sally Hill Decl., pp. 1-2. During this time, George's employment title was route supervisor, but she claims that she performed receptionist and other office duties and did little of her supervisory duties. George Decl., p. 2. Unlike her driver and route supervisor duties, a question of fact exists as to whether George's office duties while on light duty involved the safety of vehicles weighing in excess of 10,000 pounds. 29 C.F.R. § 782.2(b) (2) (in   [*13]   determining whether exemption applies, the controlling factor is the "character of the activities involved in the performance" of the job). Likewise, a question of fact exists as to whether the administrative exemption of the FLSA applies to George during this time period, given the parties' differing versions of her employment duties. George Suppl. Decl., p. 3. Therefore, defendants' motion is denied with respect to the eight-week period during which George was assigned to light duty.

With respect to Dalton, defendants admit that he is not exempt from FLSA overtime requirements under the MCA. However, defendants maintain that he has been paid all overtime wages due and move for summary judgment accordingly. Dalton maintains that he is entitled to additional overtime wages for the relevant period, because defendants did not calculate his rate of pay correctly. The parties agree that defendants' calculations are correct if Dalton and defendants had a clear, mutual understanding that he would be paid on a salary basis.

The record reflects a clear understanding between the parties that Dalton would be paid a salary wage. Sally Hill Decl., Ex. 17; Gamblin Decl., Ex. 5, p. 8, Ex. 33. Dalton   [*14]   testified to this fact at his deposition, and to the extent his declaration is considered, he identifies only one occasion that he was paid for less than a forty-hour workweek. Dalton Suppl. Decl., P5. Defendants maintain the reduction was for vacation/sick time that Dalton had not accrued, and Dalton cannot remember why he was paid less on that occasion. Therefore, I find no genuine issue of fact that precludes summary judgment with respect to Dalton.

CONCLUSION

Defendants' Motion for Summary Judgment (doc. 27) is GRANTED with respect to plaintiffs Covington,

2010 U.S. Dist. LEXIS 32472, *

Ritchie, and Dalton and GRANTED in part with respect to plaintiff George, as set forth above. Plaintiffs' Motion for Partial Summary Judgment (doc. 19) is DENIED. Defendants' Motion to Strike (doc. 36) is DENIED as moot.

    IT IS SO ORDERED.

Dated this 1st day of April, 2010.

/s/ Ann Aiken

Ann Aiken

United States District Judge

LEXSEE



Warning
As of: Mar 11, 2013

**ALVARO ALBANIL et al., Plaintiffs, v. COAST 2 COAST, INC. AND JEFFREY WAYNE TAYLOR, Defendants.**

**CIVIL ACTION H-08-486**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

**2010 U.S. Dist. LEXIS 32666**

**March 31, 2010, Decided
March 31, 2010, Filed**

**SUBSEQUENT HISTORY:** Affirmed in part and reversed in part by, Remanded by Albanil v. Coast 2 Coast, 2011 U.S. App. LEXIS 20842 (5th Cir. Tex., Oct. 13, 2011)

**PRIOR HISTORY:** Albanil v. Coast 2 Coast, Inc., 2008 U.S. Dist. LEXIS 93035 (S.D. Tex., Nov. 17, 2008)

**CORE TERMS:** summary judgment, motor vehicle, exemption, rig, minimum wage, driver, pound, chipper, carrier, transportation, overtime, compressor, passengers, pickup, rate sheet, matter of law, trailer, truck, jackhammer, transport, exempt, interstate commerce, genuine, crew, hours worked, drivers-helper, compensated, towed, air, overtime wages

**COUNSEL:** [*1] For Alvaro Albanil, Individually and on behalf of all others similarly situated, Martin Albanil, individually and on behalf of all others similarly situated, Hector Albanil, individually and on behalf of all others similarly situated, Antonio Buendia, Individually and on behalf of all others similarly situated, B. Mariano Buendia, Individually and on behalf of all others similarly situated, Pedro Buendia, Individually and on behalf of all others similarly situated, Pablo Chable, Individually and on behalf of all others similarly situated, Santos Chable, Individually and on behalf of all others similarly situated, Carlos Diaz, Individually and on behalf of all others similarly situated, Ricardo Flores, Individually and on behalf of all others similarly situated, Jose Herrera, Individually and on behalf of all others similarly situated, Elvin Marin, Individually and on behalf of all others similarly situ-

ated, Noe Martinez, Individually and on behalf of all others similarly situated, Antonio Ramirez, Individually and on behalf of all others similarly situated, Gerardo Ramirez, Individually and on behalf of all others similarly situated, Plaintiffs: Galvin B Kennedy, LEAD ATTORNEY, Kennedy [*2] Hodges PLLC, Houston, TX; Barry Sander Hersh, Hersh Law Firm PC, Dallas, TX.

For Daniel Maciel, Edwin Caceres, Plaintiffs: Galvin B Kennedy, LEAD ATTORNEY, Kennedy Hodges PLLC, Houston, TX.

For Jose Santiago Martinez, Asuncion Santiago Garcia, Jose Carlos Vasquez, Silvestre Esteban Garcia, Pedro Cortazar Lopez, Porfirio Marquez, Cristobal Galvan, Miguel Ayala Chi, Nelson Vladimir Fonseca, Ezequiel Galvan, Francisco Martin Sanchez, Gerardo Galvan, Homero Pena, Jorge Alberto Bustillo, Jose Cortazar, Lucio Olmos Mendoza, Marco Antonio Mireles, Nelson Vladimir Fonseca, Pedro Yepez Balderas, Plaintiffs: Galvin B Kennedy, Kennedy Hodges PLLC, Houston, TX.

For Abel Ramirez, Individually and on behalf of all others similarily situated, Martin Rivas, Consol Plaintiffs: Barry Sander Hersh, LEAD ATTORNEY, Hersh Law Firm PC, Dallas, TX; Galvin B Kennedy, Kennedy Hodges PLLC, Houston, TX.

For Coast 2 Coast, Inc., Defendant: G Mark Jodon, LEAD ATTORNEY, Alison Jacobs Gates, Littler Mendelson PC, Houston, TX.

For Jeffrey Wayne Taylor, Defendant: G Mark Jodon, LEAD ATTORNEY, Littler Mendelson PC, Houston, TX; Alison Jacobs Gates, Littler Mendelson PC, Houston, TX.

**JUDGES:** Gray [*3] H. Miller, United States District Judge.

**OPINION BY:** Gray H. Miller

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendants' motion for partial summary judgment on the motor carrier exemption (Dkt. 51) and plaintiffs' cross motion on the same issue (Dkt. 52); plaintiffs' motion for summary judgment on the issue of liability (Dkt 53); and plaintiffs' motions to strike portions of defendants' summary judgment responses and exhibits (Dkts. 62, 67). After review of the motions, responses, replies, and the applicable law, defendants' motion for partial summary judgment (Dkt. 51) is GRANTED and plaintiffs' motions for partial summary judgment (Dkts. 52, 53) are DENIED. Additionally, plaintiffs' motions to strike (Dkts. 62, 67) are DENIED AS MOOT, except for the request to strike defendants' rate sheet which is DENIED. Furthermore, for the reasons stated below, summary judgment is GRANTED in favor of defendants as to all of the plaintiffs' claims.

**BACKGROUND**

Plaintiffs are forty-one current and former employees of defendant Coast 2 Coast, Inc. ("C2C"), headquartered in Petersburg, Kentucky. [1] Defendant Jeffrey Wayne Taylor is the President of C2C. C2C employs laborers to remove hardened concrete [*4] from mixer drums and other enclosed spaces at customer sites throughout the United States. Plaintiffs are or were employed as either drivers or concrete removal laborers ("chippers") for C2C. Drivers and chippers are organized into "crews" led by a foreperson--the driver--and assigned to specific jobsites. The crews depart from Pasadena, Texas, and are usually gone for several weeks at a time, during which time they stay in motels paid for by C2C. The crews travel in "rigs," which are composed of either a Ford F250 or F350 pickup, fitted with a "work cap" that allows for storage of the concrete removal tools, which tows a trailer fitted with a permanently mounted air compressor that powers the tools.

[1] The drivers and chippers originally filed two separate lawsuits that were later consolidated by court order. *See* Dkt. 45.

Plaintiffs bring this case under the Fair Labor Standards Act ("FLSA"), alleging violations for failure to pay minimum and overtime wages. 29 U.S.C. §§ 206-207, 213. Specifically, plaintiffs allege that they have not been properly compensated for travel time and for other required activities. As a result, defendants have failed to pay the plaintiffs the required minimum [*5] wage and also have failed to pay them overtime wages for hours worked beyond 40 hours each workweek. Plaintiffs further allege that the defendants violated provisions of the Texas Labor Code and the FLSA by unlawfully deducting $ 28.00 per paycheck for workers' compensation insurance.

Defendants filed a motion for partial summary judgment, asserting that they are exempt from paying overtime wages by the motor carrier exemption. Dkt. 51. Plaintiffs' filed a cross motion for summary judgment on the same issue. Dkt. 52. Additionally, plaintiffs' filed a motion for partial summary judgment on the issue of liability as to the remaining claims: minimum wage violations and the improper deductions for workers' compensation insurance. Dkt. 53. Plaintiffs also filed two motions to strike certain portions of defendants' summary judgment responses and some of the summary judgment evidence submitted. Dkts. 62, 67.

**ANALYSIS**

**I. Motions to Strike**

Plaintiffs filed two motions to strike in connection with the motions for summary judgment. The first motion asks the court to strike some of the statements made by Taylor in his sworn affidavit, his declaration, and his deposition testimony; mileage reports [*6] submitted by C2C; certificates of registration from Kentucky for some of the rigs used by C2C; specification sheets and certificates of origin for some of the compressors used by C2C; the Department of Labor's ("DOL") FLSA Narrative produced as part of the DOL investigation; and affidavits signed by the plaintiffs, but not notarized, that were produced by defendants as part of a DOL investigation. Dkt. 62. As none of this contested evidence was relied upon by the court in ruling on the motions for summary judgment, this motion is DENIED AS MOOT.

The second motion to strike asks the court to strike all evidence related to defendants' assertions that they are covered by the motor carrier exemption by virtue of the chippers job duties, which entail chipping concrete out of trucks that travel in interstate commerce; weight tickets submitted as illustrative of the rigs weight and Taylor's

affidavit on the same subject; and the rate sheet submitted by the defendants to demonstrate they paid the plaintiffs more than minimum wage. Dkt. 67. The court need only address the latter item, the rate sheet, for purposes of these summary judgment motions.

Plaintiffs drop only a footnote in their motion [*7] to strike in regard to the rate sheet. Dkt 67 at n.2. Plaintiffs contend that the rate sheet is "too untimely, lacks foundation, and is inadmissible hearsay without an exception." *Id.* Defendants, however, aver that the rate sheet is simply a summation of C2C's business records kept in the ordinary course of business, the detailed business records were produced during discovery, and the rate sheet itself was produced by the agreed extended discovery deadline. Because business records kept in the normal course of business are an exception to the hearsay rule and the rate sheet is merely a summary of these records, the court DENIES plaintiffs' motion to strike the rate sheet. The remaining items in the motion to strike are DENIED AS MOOT as the court did not rely upon them in ruling on the motions for summary judgment.

## II. Summary Judgment

A timely motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). [*8] Upon a defendant's motion for summary judgment, the plaintiff "must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." FED. R. CIV. P. 56(e). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that [*9] there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . ., the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323-25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh [*10] any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## A. Motor Carrier Act ("MCA") Exemption to the FLSA's Overtime Provisions

### 1. The Legal Standard

The FLSA requires employers to pay their employees at a rate of one-and-a-half times their normal pay for hours worked in excess of [*11] forty hours per week. *See* 29 U.S.C. § 207(a)(1). There are, however, several exemptions to this overtime requirement. In particular, the overtime requirement does not apply to "any employee with respect to whom the Secretary of Transpor-

tation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act ("MCA")]." 29 U.S.C. § 213(b)(1); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181 (11th Cir.1991); *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1048 (N.D. Tex. 1993). "The Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the [MCA] are mutually exclusive and there are no overlapping areas of jurisdiction." *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir. 1993) (citing *Morris, v. McComb*, 332 U.S. 422, 437, 68 S. Ct. 131, 92 L. Ed. 44 (1947)). In order for the MCA exemption to apply, it is not necessary that the Secretary of Transportation *actually* exercise power; the Secretary needs only to possess the power to regulate the employees at issue." *Barefoot*, 826 F. Supp. at 1048 (emphasis added) (citing *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678, 67 S. Ct. 931, 91 L. Ed. 1158 (1947)).

An [*12] exemption to the FLSA is to be narrowly construed against the employer and the employer bears the burden of proof to show that it qualifies for the exemption. *Cleveland v. City of Elmendorf, Tex.*, 388 F.3d 522, 526 (5th Cir. 2004). The application of the MCA exemption "depends both on the class to which [the] employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). Specifically, this exemption applies to those class of employees: 1) employed by carriers whose transportation of passengers or property by motor vehicle is subject to the Secretary of Transportation's jurisdiction under the MCA; and 2) who directly engage in activities that affect the safety operations of motor vehicles in interstate or foreign commerce within the meaning of the MCA. *Id.; Barefoot*, 826 F. Supp. at 1049.

### 2. Discussion

a. C2C's status under the MCA for the period August 10, 2005-June 6, 2008

The MCA has undergone several revisions over the past few years, which are relevant to this case. Prior to 2005, the MCA gave the Department of Transportation ("DOT") regulatory authority over most of the light trucks and vehicles in interstate commerce, regardless of the weight of [*13] the vehicles. As a result, many employees fell under the MCA exemption to the FLSA and employers were not required to pay them overtime wages. On August 10, 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") went into effect. Pub. L. No. 109-59, § 4142, 119 Stat. 1144, 1747. This amendment restricted the DOT's regulatory authority (and thereby narrowed the FLSA exemption) to only those motor carriers and motor private who operated "commercial motor vehicles (as defined in [49

U.S.C.] section 31132)." Section 31132 defines a commercial motor vehicle as:

A motorized or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle -

(A) has a gross vehicle weight rating or a gross vehicle weight of at least 10,001 pounds, whichever is greater;

(B) is designed or used to transport more than 8 passengers (including the driver) for compensation;

(C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

(D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this [*14] title and transported in a quantity requiring placards under the regulations prescribed by the Secretary under section 5103.

Many employees that formerly fell under the MCA exemption were suddenly required to be paid overtime by this amendment. Recognizing this sudden change might catch employers off guard, Congress later included a one-year safe harbor provision for employers. *See* SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, § 306, 122. Stat. 1572, 1620. Additionally in 2008, Congress again amended the MCA exemption and changed the term "commercial motor vehicle" back to "motor vehicle," once again affording a larger class of employers exemption from the FLSA's overtime requirements. *See id.* Thus, only for the period between August 10, 2005 through June 6, 2008, did an employer have to operate a "commercial motor vehicle" in order to be exempt from the FLSA's overtime requirements.

Defendants claim that even under the narrower scope of the MCA exemption in place between 2005-2008, they still fell under the jurisdiction of the Secretary of Transportation as a motor private carrier. [2] They argue that the combined, actual, gross weight of the rig--comprised of the [*15] pickup truck with the work cap, trailer, air compressor, cargo, and passengers--exceeds the 10,001 pound commercial motor vehicle weight requirement. Dkt. 51 at 9. Plaintiffs, however, urge the court to strictly construe the definition of commercial motor vehicle and afford it its plain meaning. They point specifically to the language in 49 U.S.C. §

31132 that states a commercial motor vehicle is "a motorized *or* towed" vehicle and not both. Dkt. 52 at 16; Dkt. 61 at 3. Furthermore, plaintiffs argue, Congress implicitly rejected a definition of commercial motor vehicle that contemplated a combined gross weight by not adopting language used in DOT regulations that existed at the time of SAFETEA-LU's enactment. Dkt. 52 at 20.

   2   During the period in question, a motor private carrier was defined as:

> a person, other than a motor carrier, transporting property by commercial motor vehicle (as defined in section 31132) when--
>
>> (A) the transportation is [in interstate commerce];
>>
>> (B) the person is the owner, lessee, or bailee of the property being transported; and
>>
>> (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102. The parties [*16] dispute only that C2C was operating commercial motor vehicles.

   This last argument is unsupported by the plain language of SAFETEA-LU. With SAFETEA-LU's passage, Congress merely substituted the term "commercial motor vehicle" for the term "motor vehicle" in the definitions of "motor carrier" and "private motor carrier" found in 49 U.S.C. § 13102. Pub. L. No. 109-59, § 4142, 119 Stat. 1144, 1747. Both "commercial motor vehicle" and "motor vehicle" were terms already defined in the existing DOT statutes and the definitions were not modified by SAFETEA-LU's passage. *See* 49 U.S.C. §§ 13102(16), 31132(1). It is no surprise, therefore, that the DOT already had regulations in place that detailed how the weight of a vehicle should be calculated in determining whether it met the definition of a commercial motor vehicle. *See* 49 C.F.R. § 390.5. Thus, quite to the contrary of what the plaintiffs argue, Congress appears to have

intended the term commercial motor vehicle to be given its current (circa 2005) meaning under the existing DOT regulations, which contemplated a combined gross weight.

   Additionally, plaintiffs seem to lose sight of the fact that the FLSA's MCA exemption specifically looks to [*17] the DOT's scope of authority in determining whether an employer is subject to the overtime requirements. Because the DOL's and the DOT's jurisdiction are mutually exclusive, if the DOT *could* exercise jurisdiction over C2C's rigs, then it would belong to the class of employers to which the MCA exemption applies. The court, therefore, need only look to the DOT statutes and regulations during the period in question to see if C2C's rigs could have been under the DOT's jurisdiction.

   At the time of SAFETEA-LU's enactment in 2005 (and still in effect to the present day), the DOT regulations provide:

> Commercial motor vehicle means *any self-propelled or towed motor vehicle* used on a highway in interstate commerce to transport passengers or property when the vehicle
>
>> (1) *Has a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater;* or
>>
>> (2) Is designed or used to transport more than 8 passengers (including the driver) for compensation; or
>>
>> (3) Is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
>>
>> (4) [*18] Is used in transporting material found by the Secretary of Transportation to be hazardous under 49 U.S.C. 5103 and transported in a quantity requiring placarding under regulations prescribed by the Secretary under 49

CFR, subtitle B, chapter l,
subchapter C.

Federal Motor Safety Carrier Regulations, 49 C.F.R. § 390.5. (emphasis added). The regulation uses the same language found in 49 U.S.C. § 31132, "any self-propelled or towed motor vehicle," but then further details what combinations can be considered in determining whether a vehicle is considered to be a commercial motor vehicle. Additionally, the regulation further defines:

> Gross combination weight rating (GCWR) means the value specified by the manufacturer as the loaded weight of a combination (articulated) motor vehicle. In the absence of a value specified by the manufacturer, GCWR will be determined by adding the GVWR of the power unit and the total weight of the towed unit and any load thereon.

> Gross vehicle weight rating (GVWR) means the value specified by the manufacturer as the loaded weight of a single motor vehicle.

Id. (emphasis added). Thus, under the plain language of the regulation, the rig would be considered a commercial [*19] motor vehicle if it exceeded the 10,001 pound weight requirement. Further, this combined weight requirement would be met if the sum of the GVWR of the pickup truck (the power unit) and the total weight of the trailer (towed unit) with the attached compressor (the load thereon) exceeded 10,001 pounds. Alternatively, if the actual weight of the rig (the gross combination weight, which includes passengers and cargo) exceeded 10,001 pounds, the rig would also qualify.

b. Weight of C2C Rigs

In their motion for summary judgment, defendants point to a variety of evidence [3] to show that the rigs meet the weight requirement as a matter of law. Plaintiffs, however, contend that the defendants have no evidence of the weight of each specific rig combination (truck, trailer, and compressor) used by each individual plaintiff for each trip during the period between 2005-2008. Without such evidence, plaintiffs argue, the defendants have not met their burden, and therefore, as a matter of law do not fall under the Secretary of Transportation's jurisdiction for the period in question--this would also place the defendants outside the MCA exemption to the FLSA's overtime requirements. While it is true that

[*20] the defendants cannot produce the exact configuration of each rig used by each plaintiff on each trip, the deposition testimony makes clear that there were only so many pickup trucks, trailers, and compressors owned by C2C during the time period, and thus the combinations possible are limited. The court, therefore, finds the plaintiffs' arguments on this point unavailing. While the defendants do bear the burden to show they are exempt from the FLSA's overtime provisions, this burden cannot be insurmountable.

> 3   Some of this evidence was the subject of the plaintiffs' motions to strike, which was discussed previously.

After reviewing the summary judgment evidence before the court, C2C's rigs meet the test of a commercial motor vehicle as a matter of law under at least two of the methods detailed in the DOT regulations. First, as mentioned above, one method the DOT regulations set forth for calculating the GCWR is to sum the GVWR of the power unit (the pickup truck) with the actual weight of the trailer and load thereon. The parties acknowledge that the GVWR of the Ford F250 and F350 pickups used by C2C have GVWRs of 8800 and 9900 pounds respectively. See Dkt. 61, Ex. 3 at 64-65. Additionally,   [*21] the parties agree, or at least plaintiffs do not refute, that the weight of the compressor is at least 2,000 pounds. See Dkt. 61, Ex. 3 at 71. Thus, at a minimum, the sum of the GVWR of the pickup and the actual weight of compressor is more than 10,001, without even considering the actual weight of the trailer. The rig, therefore, meets the requirements of a commercial motor vehicle.

Second, and in the alternative, the court concludes that no reasonable jury could find that the actual weight of the rig loaded with its cargo and passengers (the gross combination weight) is less than 10,0001 pounds. Plaintiffs contend the curb weight (actual weight) of the pickups is as low as 5760 pounds. See Dkt. 52 at 24. Even so, to calculate the actual weight of the rig requires summing the actual weight of the pickup (approximately 5760 pounds), plus the weight of the compressor (2000 pounds), plus the weight of a double-axle trailer that can haul such a compressor across the country, plus the weight of the driver and four chippers that make up the crew as well as each person's luggage for a multi-week trip, and the weight of the following list of tools: six jackhammers, six steel braid jackhammer   [*22] whip hoses, six 50" 3/4" air hoses, seventy-five jackhammer chisels, twenty-five jackhammer points, fifty jackhammer upper sleeves, fifty jackhammer lower sleeves, fifty jackhammer rubbers, 100 jackhammer springs, one OSHA tripod and winch with harnesses and safety ropes, one fresh air system with four 50" steel braid air supply lines, hoods and masks for the crew, four full face respi-

rators, four half-face respirators, ten sets of safety glasses, five hard hats, 100 p-100 air filters, eight wheel chocks, eight drum chocks, five electric lockout boxes and locks, five "Do Not Operate" signs, door lockout chains and locks, one 1/2" impact gun and accompanying tool sets, one rock drill, one larger splitter jackhammer, personal protective equipment for the entire crew, eight drum lighting sets and cords, fifty replacement drum lighting bulbs, and three dozen sets of gloves. Dkt. 51, Ex. 2., P 13. It strains logic to imagine that the combined weight of all the above could be less than 10,001 pounds when the actual weight of the pickup and compressor alone weighs 7760 pounds and a crew of five adult men must, arguably, weight at least 500 pounds. This leaves a mere 1741 pounds for the weight [*23] of the double-axle trailer that can haul the 2000 pound compressor around the country and all the above equipment. Thus, for this alterative reason, the rig meets the weight requirements of a commercial motor vehicle as a matter of law.

Although, the court must view the evidence in the light most favorable to the plaintiffs when evaluating the defendants' motion for summary judgment on this issue, the plaintiffs cannot defeat summary judgment with "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." This is exactly what the plaintiffs attempt to do, offering nothing of substance to refute the weight of the rig components and thereby create a genuine issue of material fact. Therefore, under at least either of two methods specifically articulated by the DOT in calculating the weight of a vehicle in determining whether it is a commercial motor vehicle, the rigs meet the weight requirement.

c. Driver and Chipper Activities

Even if an employer is subject to the Secretary of Transportation's jurisdiction under the MCA, only those employees who directly engage in activities that affect the safety operations of motor [*24] vehicles in interstate or foreign commerce within the meaning of the MCA, are exempt from overtime pay. Drivers, as a matter of law, almost always fall within this definition. *See* 29 C.F.R. § 782.3; *Levinson*, 330 U.S. at 666-68; *Barefoot*, 826 F. Supp. at 1050. In the present case, driving rigs around the United States to the various jobsites was the main job of the drivers, and thus the driver plaintiffs clearly meet this prong of the test.

As for the chipper plaintiffs, both the plaintiffs and defendants center their arguments around whether the chippers qualify as exempt "loaders." *See* 29 C.F.R. § 782.5(a). The regulations, however, contemplate another class of workers that more closely fits the chippers' job descriptions. The regulations define a "driver's 'helper'"(or driver-helpers) as "an employee other than a driver, who is required to ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act. 29 C.F.R. § 782.4(a). "[A]n employee may be a 'helper' under the official definition even though such safety-affecting activities constitute but a minor part of his job." 29 C.F.R. § 782.4(b). Such helpers are exempt [*25] from overtime pay. 29 C.F.R. § 782.4(c). However, to be exempt, the drivers-helper "must be 'required' as part of his job to ride on a motor vehicle when it is being operated in interstate or foreign commerce; an employee of a motor carrier is not exempted as a "helper" when he rides on such a vehicle, not as a matter of fixed duty, but merely as a convenient means of getting himself to, from, or between places where he performs his assigned work." *Id.; see also Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37 (5th Cir. 1962) (empty soda bottle route helpers held to be driver-helpers); *Hernandez v. Brinks, Inc.*, 2009 U.S. Dist. LEXIS 2726, 2009 WL 113406 (S.D. Fla. Jan. 15, 2009) (messengers on armored trucks and ATM technicians held to be driver-helpers). The driver-helpers classification appears to stem from an ICC (precursor to the DOT) report issued in 1941 concerning those employees it felt affected the safety operations of vehicles under its jurisdiction. The ICC "believe[d] that it is neither necessary nor practicable to draw fine distinctions between the work done by the various employees who ride on the motor vehicle in other capacities than that of driver. To some extent at least they all engage [*26] in activities which directly affect safety of operation." *Opelika*, 299 F.2d at 43 (quoting Ex parte MC-2, 28 M.C.C. 125 (1941)).

In the present case, based on the entirety of the evidence before the court, it appears, and the plaintiffs even state so in their briefing, that the chippers were required to ride in the rig while traveling from job to job. *See, e.g.*, Dkt. 53 at 5 ("It is undisputed that . . . Defendants *require [the chippers] to travel in the truck* after performing work in Pasadena and between chipping sites."(emphasis added)). This conclusion is bolstered by the fact that the chippers are paid, in part, based on the GPS system installed in the rigs--their pay begins when they enter the customer site and ends when they depart. *See* Dkt. 53, Ex. 1 at 107. Additionally, it is undisputed that the chippers traveled in interstate commerce. Dkt. 52 at 4. Even though the chippers may have rarely, if ever, actually engaged in safety-related activities, they are still exempt from the FLSA's overtime provisions by virtue of their jobs. [4]

4   The parties disagree over whether the MCA exemption is determined on a 14-day or 4-month basis. *See* Dkts. 61 at 2; 64 at 2. The court need not reach [*27] this issue, however, because the

evidence clearly shows that the chippers rode in the rigs as a regular part of their daily activities. Thus, even the stricter 14-day basis for determining the MCA exemption is easily met under the driver-helpers analysis.

Having found that C2C operated commercial motor vehicles during the period in question, and thus was subject to the Secretary of Transportation's jurisdiction, and that both drivers and chippers are employees that affect safety operations within interstate commerce, the defendants have carried their burden with respect to the MCA exemption and are not required pay overtime wages to the plaintiffs.

## B. Minimum Wage Violations

Plaintiffs allege that they were not compensated for pre-trip work they performed, travel time to and between job sites, and attendance at various meetings. Dkt. 53. As a result, C2C violated the FLSA's minimum wage requirements. *Id.* Defendants, however, contend that the plaintiffs have failed to meet their initial burden by not offering any evidence of the hours worked that were allegedly uncompensated, let alone that C2C paid the plaintiffs less than the minimum wage. Dkt. 60 at 3.

In order to bring a claim for violations [*28] of the FLSA's minimum wage requirements, a plaintiff bears "the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946)*. If the employer has kept accurate records, a plaintiff can easily meet this burden by securing the production of those records. *Id.* Where the employer, however, has failed to keep accurate records, the courts have imposed a burden shifting framework:

> the employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687-88; *see also Reeves v. Int'l Tel. and Tel. Corp., 616 F.2d 1342, 1351 (5th Cir. 1980)*.

C2C historically [*29] destroyed timesheets after processing payroll. *See* Dkt. 53, Ex. 3 at 172. Thus, to meet their burden, plaintiffs need only show "sufficient evidence" of the amount and extent of the work performed. Additionally, to show a violation of the minimum wage requirement, the plaintiffs must show that the total weekly hours divided by their pay is less than the required minimum wage. *See United States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 490 (2nd Cir. 1960)*.

Plaintiffs, however, have wholly failed to meet this burden. They have produced no evidence whatsoever concerning how many hours plaintiffs worked, but were not compensated for. Neither have they shown that plaintiffs' total number of weekly hours worked divided by their weekly pay is less than the minimum wage. In contrast, defendants submitted evidence of the plaintiffs' hourly wage rates, all of which were above minimum wage. *See* Dkt. 60, Ex. 2. Even if the court were to agree with plaintiffs' that they should have been compensated for some of the activities they performed, this would not be enough to show a minimum wage violation--the violation occurs only if the total hours worked divided by the pay is less than the minimum [*30] wage. *See Hutson v. Rent-A-Center, Inc., 209 F. Supp. 2d 1353, 1359 (M.D. Ga. 2001)* ("Plaintiff seems to assume that for each hour worked in excess of forty in a week, he is entitled to receive a minimum wage payment for the hours over forty per week, regardless of what he was paid for the other forty hours. This reasoning is flawed, as shown by Section 30b02 of the *Field Operations Handbook* which provides: 'if the employee's total earning for the w/w [workweek] . . . divided by the compensable hours equals or exceeds the applicable MW [minimum wage], the employee has been paid in compliance with Sec 6.' Wage-Hour *Field Operations Handbook*, § 30b02, 12/9/88. Plaintiff has not produced any evidence showing that his total earnings are less than what he would have received if he had been paid the minimum wage for every hour worked.").

As plaintiffs have failed to meet their initial burden on the minimum wage violations and sufficient opportunity was afforded both sides to brief the matter, the court finds it appropriate to grant the defendants' summary judgment on this issue. [5]

5   Although the defendants did not specifically file a motion for summary judgment on the minimum wage violation, [*31] they did ask in their response to plaintiffs' motion for summary judgment that the court deny these claims as a matter of law. *See* Dkt. 60 at 4.

## C. Deductions for Workers' Compensation Insurance

Plaintiffs contend that defendants violated both the Texas Labor Code and the FLSA by withholding $ 28.00 per pay period from each of the plaintiffs' paychecks for workers' compensation insurance. Dkt. 53 at 14. The Texas Labor Code prohibits an employer from "collect[ing] from an employee, directly or indirectly, a premium or other fee paid by the employer to obtain workers' compensation insurance coverage, except as provided in [sections of the Texas Labor Code that deal with subcontractors and contractors]." TEX. LAB. CODE § 415.006(a). Violations of this provision are considered an "administrative violation." § 415.006(c). Thus, the proper remedy for such a violation is to request an administrative hearing. Only after such a hearing is the decision subject to judicial review. § 415.035. Because the plaintiffs are not appealing an administrative decision on this matter, this court lacks subject matter jurisdiction to hear this claim.

Additionally, plaintiffs's claims also fail under the FLSA [*32] for the same reason their minimum wage violations fail--the plaintiffs fail to show that this deduction reduced their pay to below the applicable minimum wage. See *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972). Plaintiffs contend that 29 C.F.R. § 531.38 entitles the plaintiffs to recover as a matter of law for these deductions under the FLSA. See Dkt. 53 at 14. The regulation provides: "No deduction may be made for any tax or share of a tax which the law requires to be borne by the employer." 29 C.F.R. § 531.38. A closer reading of the regulation as a whole, however, makes it clear that this particular section of the regulation is talking about which taxes can be considered "wages" under the FLSA. This statement, therefore, taken in context, means that an employer cannot consider taxes borne by the employer as part of a employee's wages in making such calculations for purposes of the FLSA. To show an actual violation of the FLSA, the plaintiff is still required to show that the employees' total weekly hours divided by his weekly pay is less than the minimum wage.

Therefore, plaintiffs' claims for the workers' compensation deduction under the Texas [*33] Labor Code are dismissed for lack of subject matter jurisdiction. Additionally, plaintiffs having failed to meet their initial burden to show a violation of the minimum wage requirement for this deduction under the FLSA, and defendants are granted summary judgment with regard to this claim. [6]

> 6    Although the defendants did not specifically file a motion for summary judgment on this violation either, they did ask in their response to plaintiffs' motion for summary judgment that the court deny these claims as a matter of law. *See* Dkt. 60 at 7.

In sum, defendants have met their burden to show they fall within the MCA exemption from the FLSA's overtime pay requirements for the period between 2005-2008. Additionally, defendants are granted summary judgment with respect to plaintiffs' claims for minimum wage violations and the workers' compensation deduction. The court, therefore, need not reach the remaining FLSA issues posed by the parties: whether C2C committed a wilful violation of the FLSA, whether C2C acted in good faith in believing they complied with the FLSA, and whether defendant Taylor is considered an employer for purposes of the FLSA.

## CONCLUSION

For the reasons stated above, defendants' [*34] motion for summary judgment on the MCA exemption is GRANTED. Additionally, defendants are GRANTED summary judgment with respect to all other claims. Plaintiffs' motions for summary judgment are, therefore, DENIED. Lastly, plaintiffs' motions to strike are DENIED AS MOOT, except with respect to the rate sheet, which is DENIED.

Signed at Houston, Texas on March 31, 2010.

/s/ Gray H. Miller

Gray H. Miller

United States District Judge

LEXSEE

⚠
Caution
As of: Mar 11, 2013

**RICHARD TIDD, KRISTI GRUHN, and all others similarly situated, Plaintiffs v. ADECCO USA, INC., KELLY SERVICES, INC., FEDEX GROUND PACKAGE SYSTEM, INC., and FEDEX GROUND PACKAGE SYSTEM, INC. d/b/a FEDEX HOME DELIVERY, Defendants.**

**CIVIL ACTION NO. 07-11214-GAO**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHU-SETTS**

**2008 U.S. Dist. LEXIS 69825**

**September 17, 2008, Decided**

**SUBSEQUENT HISTORY:** Reconsideration denied by Tidd v. Adecco USA, Inc., 2009 U.S. Dist. LEXIS 49234 (D. Mass., Jan. 21, 2009)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employees brought a purported class action against defendant temporary employment agencies, asserting jurisdiction under the Fair Labor Standards Act (FLSA) and the Class Action Fairness Act of 2005 (CAFA). Jurisdiction was not sufficient under the CAFA, and state law claims were dismissed except for those brought under state law from states in which the employees lived. The case was before the federal district court on many motions.

**OVERVIEW:** The agencies sought partial summary judgment regarding the employees' FLSA and similar state law claim. The question was how the definition of "motor carrier" promulgated by the U.S. Congress in 2005 when it passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Uses, Pub. L. No. 109-59, 119 Stat. 1144 (2005), as codified in 49 U.S.C.S. § 13102(14), affected the FLSA's Motor Carrier Act Exemption, 29 U.S.C.S. § 213(b)(1). According to the district court, as the company for whom the employees worked used commercial motor vehicles to transport property in interstate commerce, as contemplated by 49 U.S.C.S. § 31132(1), it was a motor carrier pursuant to § 13102(14) as to whose employees the Sec-

retary of Transportation could prescribe requirements for maximum hours of service under 49 U.S.C.S. § 31502(1). Accordingly, the Exemption applied, and the FLSA claims were foreclosed. The employees' motion to amend, though, was partially granted, as was their motion for conditional certification of an FLSA class and for 29 U.S.C.S. § 216(b) opt-in notice for similarly situated employees. But equitable tolling of the statute of limitations was not warranted.

**OUTCOME:** The agencies' motion for partial summary judgment was granted. The employees' motion to amend was granted in part and denied in part. The employees' motion to certify a class conditionally and to permit opt-in notice for FLSA claims was granted. Finally, the agencies' motion to stay was moot.

**CORE TERMS:** carrier, transportation, driver, maximum, trucks, motor vehicle, hours of service, exemption, notice, Motor Carrier Act Exemption, overtime, weighing, law claims, overtime wages, qualifications, passenger, transport, pound, tons, opt-in, amend, failure to pay, equitable tolling, prescribe, exempting, partial, region, temporary, state law, breach of contract

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > General Overview*

[HN1]The Supreme Judicial Court of Massachusetts has recognized that the Massachusetts overtime law, including the exemptions contained in Mass. Gen. Laws ch. 151, § 1A, follows the Fair Labor Standards Act. The Massachusetts state overtime laws are intended to be essentially identical to federal law.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Transportation Industries*
*Transportation Law > Commercial Vehicles > Maintenance & Safety*

[HN2]The Fair Labor Standards Act generally requires that overtime wages, at the rate of one and one-half times the employee's regular wage, be paid to the employee for hours worked in excess of 40 hours per week, except in limited situations. 29 U.S.C.S. § 207(a)(1). One such exception is the Motor Carrier Act Exemption, 29 U.S.C.S. § 213(b)(1), which provides that 29 U.S.C.S. § 207 shall not apply regarding: (1) any employee with respect to whom the Secretary of Transportation can establish qualifications and maximum hours of service pursuant to 49 U.S.C.S. § 31502. The Secretary of Transportation can establish qualifications and maximum hours of service for certain employees of motor carriers. Section 31502 provides that the Secretary of Transportation may prescribe requirements for: (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation. § 31502(b)(1)-(2). Before August 2005, a "motor carrier," as used in § 31502, meant a person providing motor vehicle transportation for compensation. 49 U.S.C.S. § 13102(12), amended by Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Uses, Pub. L. No. 109-59, 119 Stat. 1144 (2005).

*Transportation Law > Commercial Vehicles > General Overview*

[HN3]In August 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), which altered the definition of the term "motor carrier." Pub. L. No. 109-59, 119 Stat. 1144 (2005). "Motor carrier" was redefined as a person providing commercial motor vehicle (as defined in 49 U.S.C.S. § 31132) transportation for compensation. 49 U.S.C.S. § 13102(14). "Commercial motor vehicle" was defined as: (1) "commercial motor

vehicle" means a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle: (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater; (B) is designed or used to transport more than 8 passengers (including the driver) for compensation; (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or (D) is used in transporting material found by the Secretary of Transportation to be hazardous under 49 U.S.C.S. § 5103 and transported in a quantity requiring placarding under regulations prescribed by the Secretary under § 5103. 49 U.S.C.S. § 31132(1)(A)-(D).

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Transportation Industries*
*Transportation Law > Commercial Vehicles > General Overview*

[HN4]An employer is a "motor carrier" if it meets the definition of 49 U.S.C.S. §§ 13102(14) and 31132(1) because it uses 10,001 pound-plus trucks in interstate commerce, even if it also conducts other operations that do not meet that definition. In that case, the Motor Carrier Act Exemption, 29 U.S.C.S. § 213(b)(1), applies, and the Secretary of Transportation would be empowered, exclusively, to prescribe the maximum hours of service for the company's drivers.

*Governments > Legislation > Statutes of Limitations > Tolling*

[HN5]The statute of limitations is to be equitably tolled only in rare circumstances.

**COUNSEL:**   [*1] For Richard Tidd, and all others similarly situated, Kristi Gruhn, and all others similarly situated, Plaintiffs: Shannon E. Liss-Riordan, LEAD ATTORNEY, Erica F. Crystal, Harold L. Lichten, Pyle, Rome Lichten, Ehrenberg & Liss-Riordan, P.C., Boston, MA.

For Adecco USA, Inc., Defendant: Donald W. Schroeder, LEAD ATTORNEY, Kevin M. McGinty, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA; James M Nicholas, LEAD ATTORNEY, Mintz Levin, Boston, MA.

For Kelly Services, Inc., Defendant: Anthony S. Califano, Brigitte M. Duffy, Leah Miriam Moore, Richard L. Alfred, LEAD ATTORNEYS, Seyfarth Shaw, LLP, Boston, MA; Gerald L. Maatman, Jr., LEAD ATTORNEY, Seyfarth Shaw LLP, Chicago, IL.

For Fedex Ground Package System, Inc., doing business as Fedex Home Delivery, Defendant: Emily J. Tidmore, Kenneth D. Sansom, Robert Spotswood, LEAD AT-TORNEYS, Spotswood, Sansom & Sansbury LLC, Birmingham, AL; Michael K. Clarkson, Morgan, Brown & Joy, LLP, Boston, MA.

For Fedex Ground Package System, Inc., Defendant: Emily J. Tidmore, Kenneth D. Sansom, Robert Spotswood, LEAD ATTORNEYS, Spotswood, Sansom & Sansbury LLC, Birmingham, AL; Michael K. Clarkson, LEAD ATTORNEY, Morgan, Brown & Joy, LLP, Boston,   [*2] MA.

**JUDGES:** George A. O'Toole, Jr., United States District Judge.

**OPINION BY:** George A. O'Toole, Jr.

**OPINION**

OPINION AND ORDER

O'TOOLE, D.J.

This purported class action is brought on behalf of individuals who were employed by the defendants Adecco USA and Kelly Services (temporary employment agencies), and who worked as pick-up and delivery drivers for defendants FedEx Ground Package System, Inc. and FedEx Ground Package System, Inc. d/b/a Fed-Ex Home Delivery (collectively "FedEx"). The plaintiffs allege that they are owed unpaid regular and overtime wages.

The original complaint asserted jurisdiction on the basis of two federal statutes -- the Fair Labor Standards Act ("FLSA") and the Class Action Fairness Act of 2005 ("CAFA") -- and alleged three causes of action: (1) failure to pay all wages due under the FLSA and the wage laws of various States, (2) failure to pay overtime wages under the FLSA and the overtime laws of various States for overtime hours spent in training, and (3) failure to pay overtime to plaintiffs who have driven trucks weighing less than 10,001 pounds due under the FLSA and the wage laws of those States that have adopted the Federal Motor Carrier Act Exemption.

The defendants moved to dismiss   [*3] the complaint. After the hearing, I concluded that the plaintiffs had not sufficiently pled federal jurisdiction under CAFA. I also held that the named plaintiffs had standing only to bring claims under the laws of the States in which they resided. Therefore, I dismissed all state law claims except for those brought under Massachusetts and Vermont state law (the places of residence of the two named plaintiffs). The plaintiffs were instructed to file an amended complaint that comported with those rulings. Since then, both parties have filed a variety of both substantive and procedural motions. This Order resolves the several pending motions.

**I. Defendants' Motion for Partial Summary Judgment (dkt. no. 49)**

The defendants have moved for partial summary judgment with respect to the plaintiffs' FLSA claim of unpaid overtime wages and their similar claim to unpaid overtime wages under Massachusetts state law. [1]

> 1   [HN1]The Supreme Judicial Court of Massachusetts has recognized that the Massachusetts overtime law, including the exemptions contained in Massachusetts General Laws ch. 151, § 1A, follows the FLSA. See Swift v. AutoZone, Inc., 441 Mass. 443, 806 N.E.2d 95, 98 (Mass. 2004) (stating that the Massachusetts   [*4] state overtime laws "were intended to be 'essentially identical' to Federal law") (quoting Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 40 (1st Cir. 1999)); Goodrow v. Lane Bryant, Inc., 432 Mass. 165, 732 N.E.2d 289 (Mass. 2000).

[HN2]The FLSA generally requires that overtime wages, at the rate of one and one-half times the employee's regular wage rate, be paid to the employee for hours worked in excess of forty hours per week, except in certain limited situations. 29 U.S.C. § 207(a)(1). One such exception is the Motor Carrier Act Exemption, codified at 29 U.S.C. § 213(b)(1), which provides:

> The provisions of section 207 of this title shall not apply with respect to--
>
> (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49;

The Secretary of Transportation is authorized to establish qualifications and maximum hours of service for certain employees of "motor carriers." Section 31502 of Title 49 provides:

> The Secretary of Transportation may prescribe requirements for--
>
> (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of,   [*5] a motor carrier; and

(2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

49 U.S.C. § 31502(b)(1)-(2).

Prior to August 2005, a "motor carrier," as used in 49 U.S.C. § 31502, was defined as follows:

The term "motor carrier" means a person providing motor vehicle transportation for compensation.

49 U.S.C. § 13102(12) (2000), amended by Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Uses, Pub. L. No. 109-59, 119 Stat. 1144 (2005). ² FedEx clearly qualified as a "motor carrier" under these provisions, and the Secretary of Transportation thus had the power to prescribe the maximum hours for those employees of FedEx whose work affected the "safety of operation and equipment of" FedEx. ³

2   "Motor vehicle" was in turn defined as:

The term "motor vehicle" means a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary, but does not include a vehicle, locomotive, or car operated only on a rail, or a trolley bus operated by electric power from [*6] a fixed overhead wire, and providing local passenger transportation similar to street-railway service.

49 U.S.C. § 13102(14).
3   Drivers are such employees. See Levinson v. Spector Motor Serv., 330 U.S. 649, 673, 67 S. Ct. 931, 91 L. Ed. 1158 (1947); Southland Gasoline Co. v. Bayley, 319 U.S. 44, 48-49, 63 S. Ct. 917, 87 L. Ed. 1244 (1943).

[HN3]In August 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), which altered the relevant definition of the term "motor carrier." Pub. L. No. 109-59, 119 Stat. 1144. "Motor carrier" was redefined as:

The term "motor carrier" means a person providing *commercial motor vehicle* (as defined in section 31132) transportation for compensation.

49 U.S.C. § 13102(14) (West 2005) (emphasis added). "Commercial motor vehicle" was defined as:
(1) "commercial motor vehicle" means a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle--

(A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;

(B) is designed or used to transport more than 8 passengers (including the driver) for compensation;

(C) is designed or used to transport more [*7] than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

(D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103.

Id. § 31132(1)(A)-(D).

The question presented by the defendants' motion for partial summary judgment is how the new definition of "motor carrier" affects the FLSA's Motor Carrier Act Exemption. The plaintiffs argue that under the new definition only those employees whose work affects the safety of operation of vehicles weighing more than 10,000 pounds are subject to the Motor Carrier Act Exemption. The argument proceeds in steps that parallel the statutory elaboration of the exemption: (1) The exemption applies if the Secretary of Transportation has the power to regulate an employee's hours. (2) The Secretary of Transportation has such power with respect to certain employees of a "motor carrier." (3) A motor carrier is a person providing "commercial motor vehicle" transportation for hire. (4) A commercial motor vehicle is one, for present purposes, [*8] having a gross vehicle weight of at least 10,001 pounds.

So far, so good. The plaintiffs then argue that a company like FedEx is a "motor carrier" subject to hours regulation by the Secretary of Transportation *only to the extent* that it operates trucks weighing more than five tons, because those heavier vehicles are "commercial motor vehicles" for purposes of the "motor carrier" definition in § 31502 of Title 49, and, conversely, that a company is not a "motor carrier" to the extent it operates trucks weighing five tons or less.

With respect to the 10,001 pound dividing line, a trucking company would fall within one of three categories. It might operate only trucks weighing more than five tons, in which case it would clearly be a "motor carrier" subject to regulation by the Secretary of Transportation with respect to employee hours. Or it might operate only trucks weighing five tons or less, in which case it would just as clearly not be a "motor carrier." In the third case, it might operate a fleet that includes trucks both bigger and smaller than five tons. FedEx is in this category. The plaintiffs propose that the statutes be interpreted to give the Secretary of Transportation the [*9] power to regulate hours of FedEx employees whose work affects the safety of operation of the larger trucks, but to deny the Secretary that power as to those FedEx employees whose work affects the smaller trucks. As to the latter class of employees, the Motor Carrier Act Exemption would not apply, and relief under the FLSA would be available.

There are a number of statutory exemptions from the maximum hour provisions of the FLSA. 29 U.S.C. § 213(b). Some are defined by reference to the nature of the work performed by the employee in question. See, e.g., id. § 213(b)(6) (exempting "any employee employed as a seaman"); id. § 213(b)(15) (exempting "any employee engaged in the processing of maple sap into sugar (other than refined sugar) or syrup"). Others are defined not by reference to the particular employee's own

work but by reference to the operations of the employee's employer. See, e.g., id. § 213(b)(2) (exempting "any employee of an employer engaged in the operation of a rail carrier subject to Part A of subtitle IV of Title 49"); id. § 213(b)(27) (exempting "any employee employed by an establishment which is a motion picture theater"). The Motor Carrier Act Exemption uses a different [*10] method; its point of reference is whether "the Secretary of Transportation has power to establish qualifications and maximum hours of service [for the relevant employee] pursuant to the provisions of section 31502 of Title 49." Id. § 213(b)(1).

As noted, the Secretary has that power with respect to safety-related employees (including drivers) of a "motor carrier." The question thus devolves to whether FedEx is either a "motor carrier" or not, or whether it can be both a "motor carrier" and not one at the same time with respect to different employees.

In theory, it is possible that a company like FedEx could be deemed a "motor carrier" to the extent it operated bigger trucks and not a "motor carrier" to the extent it operated smaller trucks, so that the Secretary of Transportation would have the authority to regulate hours of service for some drivers and the Secretary of Labor would have similar authority for other drivers. Without some specific indication that Congress intended such a bifurcation of regulatory responsibilities -- that is, an affirmative indication beyond the simple fact of the statute's ambiguity -- the theory does not recommend itself. As a practical matter, dividing [*11] between agencies the responsibility for regulating maximum hours for similar employees of a given employer, while not impossible to conceive, as a practical matter would no doubt lead to a proliferation and complication of rules and enforcement. As FedEx points out, its drivers may not be easily placed in one category or the other. For example, drivers might drive both categories of trucks at different times. For such drivers, bifurcating the regulatory responsibilities would mean that some of the time their maximum hours would be regulated by the Secretary of Transportation and some of the time they would be regulated by the Secretary of Labor. How one might compute the maximum hours in a workweek regulated by different standards is an interesting question.

A more sensible approach is the "either-or" interpretation. This approach would deem [HN4]an employer to be a "motor carrier" if it meets the definition of sections 13102(14) and 31132(1) of Title 49 because it uses 10,001 pound-plus trucks in interstate commerce, even if it also conducts other operations that do not meet that definition. In that case, the Motor Carrier Act Exemption would apply, and the Secretary of Transportation would [*12] be empowered, exclusively, to prescribe the maximum hours of service for the company's drivers.

The plaintiffs' interpretation would effectively re-write section 31502 of Title 49 to make an individual *employee's* daily work the determining factor as to the Secretary of Transportation's regulatory authority, rather than the specified characteristic of the *employer*. As noted above, the FLSA does hinge the applicability of some exemptions on what the employee does. It hinges others on what the employer does. The Motor Carrier Exemption is more like the second method than the first, even after the SAFETEA-LU amendment.

In sum, FedEx uses "commercial motor vehicles" to transport property in interstate commerce, 49 U.S.C.§ 31132(1), and is therefore a "motor carrier," 49 U.S.C. § 13102(14), as to whose employees the Secretary of Transportation has the power to prescribe requirements for maximum hours of service, 49 U.S.C. § 31502(1). Accordingly, the Motor Carrier Act Exemption applies, 29 U.S.C. § 213(b)(1), and the plaintiffs' claims under the FLSA are foreclosed. The motion for partial summary judgment is therefore GRANTED.

## II. Plaintiffs' Motion to Amend (dkt. no. 46)

The plaintiffs have   [*13] moved to amend their complaint in three ways: (1) by adding three additional named plaintiffs, (2) by adding nationwide class claims for breach of contract and unjust enrichment/quantum meruit, and (3) by incorporating the changes required as a result of my earlier ruling on the defendants' motion to dismiss.

I will permit the addition of Stephanie Chiappa, a resident of Connecticut, as a named plaintiff, but not the proposed addition of Kenneth Scott and Victoria Johnson, because neither is sufficiently similarly situated to the existing named plaintiffs. What the existing plaintiffs and Chiappa have in common is that all three were employed within FedEx's New England region and thus subject to the same management officials and policies. Scott is a resident of New Jersey and Johnson is a resident of Mississippi. The affidavits submitted by Johnson and Scott do not set forth facts sufficient to support a conclusion that the same employment practices the existing plaintiffs complain of were followed in other regions by other FedEx managers. Without such facts, it would be only speculation to say that the New Jersey and Mississippi employees' claims were sufficiently similar to the existing   [*14] claims to warrant their joinder. Although Johnson complains of the same general wage violations, absent from her affidavit is any mention of a common plan or policy on FedEx's part to not pay temporary drivers for all hours worked. Unlike Johnson's affidavit, Kenneth Scott's affidavit does state that the failure to pay overtime was a "common problem,"(Kenneth Scott Aff P 14), but there is no indication in such a general allegation that the "common problem"

alleged by Scott in New Jersey is the same "common problem" alleged by the current New England employees. See *Beauperthuy v. 24 Hour Fitness USA, Inc.*, No. 06-0715-SC, 2007 U.S. Dist. LEXIS 21315, 2007 WL 707475, at *6 (N.D. Cal. Mar. 6, 2007).[4]

> 4 Since Scott and Johnson will not be part of the FLSA collective action, I decline to exercise supplemental jurisdiction over any state law claims raised by them. See 28 U.S.C. § 1367(c).

For the same reasons stated in open court at the February 6, 2008 hearing on the defendants' motion to dismiss, I conclude that the named plaintiffs lack standing to assert the proposed nationwide state common law claims for breach of contract and unjust enrichment/quantum meruit. However, because I have already exercised supplemental   [*15] jurisdiction over the Massachusetts and Vermont statutory state law claims, I will permit the common law breach of contract and unjust enrichment/quantum meruit claims from those two states to proceed. Therefore, I will grant leave to amend the complaint to include the state common law claims asserted under Massachusetts and Vermont state law.

Finally, leave to amend is also granted to make those changes necessary to respond to my earlier ruling of February 6, 2008.

In sum then, the motion to amend is GRANTED in PART and DENIED in PART. The complaint may be amended as follows: (1) Stephanie Chiappa may be added as a named plaintiff, (2) the claims for breach of contract and unjust enrichment/quantum meruit under Massachusetts and Vermont state law may be added, and (3) any stylistic changes necessary to comply with my February 6, 2008 ruling may be made.

## III. Plaintiffs' Motion to Certify Class Conditionally and Permit § 216(b) Opt-In Notice for FLSA Claims (dkt. no. 33)

I find that the plaintiffs have demonstrated that other similarly situated potential class members exist, and therefore I will allow opt-in notice to be sent to those similarly situated plaintiffs. The scope of the opt-in   [*16] class is limited to those trainees and temporary drivers who were employed in FedEx's New England Region and are allegedly owed regular compensation under the FLSA. Therefore, I will GRANT the motion to conditionally certify an FLSA class and to permit opt-in notice to be sent to all temporary drivers employed by the defendants who worked in the New England Region of FedEx for both their Home and Ground divisions within the past three years. The parties are to confer and submit a proposed joint notice that may be sent to the class within thirty (30) days. If the parties are unable to

agree on the language of the proposed notice, then the parties are to submit their respective versions of the proposed notice within the same time.

The plaintiffs also request that I rule that [HN5]the statute of limitations is equitably tolled in this case. Although equitable tolling has been applied by some courts in the FLSA context, I conclude that it is inappropriate to do so here. Equitable tolling is to be invoked only in rare circumstances. Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 71 (1st Cir. 2005); see also Delaney v. Matesanz, 264 F.3d 7, 14 (1st Cir. 2001) ("[E]quitable tolling, if available [*17] at all, is the exception rather than the rule; resort to its prophylaxis is deemed justified only in extraordinary circumstances."). The plaintiffs have not alleged any extraordinary circumstance to warrant equitable tolling nor have they pointed to any wrongdoing by the defendants that would justify a tolling order. Indeed, the circumstances of this case are not substantially different from other FLSA cases, and acceptance of the plaintiffs' argument would essentially mean that equitable tolling should occur in every FLSA collective action, changing the principle of equitable tolling from the exception to the norm.

**IV. Defendants' Motion to Stay (dkt. no. 36)**

While the defendants' motion to dismiss was pending, the plaintiffs filed their motion to certify the class conditionally and permit § 216(b) opt-in notice for the FLSA claims. The defendants then moved to stay consideration of those class certification and notice issues. At this point, the motion to stay is MOOT.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.

United States District Judge

LEXSEE



Positive
As of: Mar 11, 2013

**MARK ELLIOT, RANDALL TOWE, and DANIEL TINCH, Plaintiffs, vs. DAVE ERNSTES & SONS TRUCKING, Defendant.**

**1:05-cv-1891-JDT-WTL**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION**

**2006 U.S. Dist. LEXIS 72278**

**October 3, 2006, Decided**

**CORE TERMS:** driver, carrier, interstate, exemption, trip, out-of-state, overtime, transportation, summary judgment, interstate commerce, assigned, time sheets, intrastate, Motor Carrier Act, travel, drove, route, dump trucks, period of time, partial, matter of law, administering, maximum, qualify, driving, times, state law claims, general rule, truck drivers, time to time

**COUNSEL:** [*1] For MARK ELLIOT, RANDALL TOWE, DANIEL TINCH, Plaintiffs: Gabriel Adam Hawkins, PRICE WAICUKAUSKI & RILEY, Indianapolis, IN.

For DAVE ERNESTES & SON TRUCKING, Defendant: John P. Cook, DUNN & COOK, Franklin, IN.

**JUDGES:** John Daniel Tinder, Judge.

**OPINION BY:** John Daniel Tinder

**OPINION**

**ENTRY ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 23) AND DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 38).**

> 1    This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

Plaintiff truck drivers Mark Elliot, Randall Towe and Daniel Tinch ("Plaintiffs") have filed this action against Dave Ernstes & Sons Trucking ("Ernstes") [2] alleging, among other things, that Ernstes failed to pay them overtime wages as required by the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 201 et seq. Ernstes admits not paying Plaintiffs overtime but maintains that under [*2] the motor carrier exemption to the FLSA it does not have to. 29 U.S.C. § 213(b)(1). Section 213(b)(1) states that the overtime provision of the FLSA does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." Id. Plaintiffs filed a motion for partial summary judgment on their FLSA claim arguing that the motor carrier exemption did not apply; Ernstes filed its own motion for partial summary judgment arguing that it did.

> 2    Plaintiffs have not named David E. Ernstes as a defendant. Dave Ernstes & Sons Trucking is a sole proprietorship of Mr. Ernstes, (Ernstes Aff. P 2); thus, it has no legal existence separate from him. Despite this, the court will refer to the sole proprietorship, not Mr. Ernstes, as the defendant because the parties have done so in their briefs.

**I. BACKGROUND**

Plaintiffs are suing Ernstes on numerous counts related [*3] to their employment with Ernstes as truck drivers. This motion deals only with Plaintiffs' FLSA claim. The parties agree on the basic facts of the case.

2006 U.S. Dist. LEXIS 72278, *

The only issue to decide in this motion is for what period of time Ernstes qualifies for the motor carrier exemption to the FLSA, awarding Plaintiffs damages for the period of time it does not.

Defendant is a motor carrier based in Shelbyville, Indiana, that performs both in-state and out-of-state transportation services. (Ernstes Aff. PP 2, 6.) Ernstes has the appropriate licenses from the Department of Transportation ("DOT") and maintains its vehicles pursuant to DOT regulations. (*Id.* PP 4-5.) Plaintiffs were all employees of Ernstes some time between 2003 and 2005 and principally drove dump trucks. Elliot was employed from March 2004 to May 2005. (Pls.' Ex. E.) Tinch was employed from April 2002 to May 2004. *Id.* Towe began employment in February 2000 and according to the evidence still works for Ernstes. [3] (*Id.*)

> 3   Plaintiffs claim they are entitled to overtime payment for weeks when they did not travel out of state. However, it is not clear exactly what periods of time Plaintiffs believe they are entitled to overtime payment. The court will assume they claim from December 2003 until the end of 2005, which is the period of time for which they have provided time sheets.

[*4]  Around spring of 2003, Ernstes acquired an account with Schuster's Building Products ("Schuster's"). (Ernstes Aff. P 7.) This involved picking up sand, pea gravel, and haydite [4] from various Indiana locations and taking it to Schuster's Indianapolis, Indiana location. (Towe Aff. P 3; Tinch Aff. P 3; Elliot Aff. P 3.) The material was processed into bricks and other material. (Towe Aff. P 4; Tinch Aff. P 4; Elliot Aff. P 4.) Both sides seem to agree that these activities do not constitute interstate travel for the purposes of the motor carrier exemption.

> 4   Haydite is a lightweight building material made from shale.

During this time, Ernstes continued to solicit other business. Some of the business he received included out-of-state runs for various companies hauling salt products to or from Cincinnati, Ohio and slag to Ghent, Kentucky. (Ernstes Aff. P 11.) When out-of-state runs required a dump truck, David Ernstes would assign the least busy driver to the run. On occasion, a driver would ask not to be assigned [*5]  and Ernstes would find someone else; sometimes a driver would refuse to go on an out-of-state run, even if there was no other work. (*Id.* at P 13.) Employees who drove on Schuster's assignments, like Plaintiffs, also drove out of state several times a year. (*Id.* at P 12.) Ernstes claims that Elliot was the only driver less likely than another to travel out of state because Elliot got lost easily. He was sent out of

state only if there was another driver going on the run for him to follow. (Ernstes Aff. P 14-15.) Neither side presents any evidence as to what proportion of Ernstes's business was interstate versus intrastate.

What little evidence the parties have presented is difficult to decipher. Plaintiffs have submitted a portion of their time sheets as exhibits A through C. (Pls.' Exs. A-C.) For someone unfamiliar with Ernstes's business and customary notation, they are tricky to decode. Plaintiffs provide no summary or even an idea of what an observer should glean from them except their vague assertion that the "vast majority" of their time was spent on Schuster's intrastate work. (Towe Aff. P 3; Tinch Aff. P 3; Elliot Aff. P 3.) Ernstes, on the other hand, has compiled [*6]  a summary of out-of-state trips by driver. (Def.'s Ex. A, Attachment 3.) However, he has provided no records to verify his account. This might not be problematic in itself, but Ernstes's summary conflicts with the Plaintiffs' time sheets. It is far from certain which is right. [5] For the purpose of Plaintiffs' motion, it will be assumed that Ernstes's numbers are correct; for the purpose of Defendant's motion, it will be assumed that the trips mentioned in the time sheets are the only out-of-state runs. Regardless of which figures are right, it is clear that the vast majority of Plaintiffs' work was done on intrastate Schuster's runs; although, each Plaintiff made multiple out-of-state trips during his employment. [6]

> 5   It is not even clear that these are the complete records for each driver during the periods they cover. They appear to be compiled by truck and not by driver, and there are dates for which there is no entry. Ernstes claims that these drivers drove both semis and dump trucks (Def.'s Ex. A, Attachment 3), but all of the time sheets are for dump trucks only. Ernstes has compiled what it says is a summary of out-of-state trips, but its numbers are higher than what can be verified from the time sheets submitted. This may be because the driver drove a semi certain days instead of a dump truck, but there is no way to tell from the evidence submitted to the court. The year that Ernstes gives for the number of trips is also different. For example, Ernstes claims that Elliot made no out of state trips in 2004 and made seven in 2005. It appears from his time sheets that Elliot made around eight out of state trips in 2004 and none in 2005. (*Id.*; Pls.' Ex. A.) This may be because Defendant's fiscal year is not the same as the calendar year, but again it is impossible to say.

[*7]
> 6   During his little over a year with the company from March 2004 to May 2005, Elliot made

only around eight runs out of state. The time sheets and Ernstes's summary seem to agree. According to the time sheets, these were all done in June, July and August of 2004. At all other times, Elliot made trips for Schuster's intrastate. (Pls.' Ex. A.) Ernstes's tally is about the same, although he lists trips in 2005 rather than in 2004. (Def.'s Ex. A, Attachment 3.)

Tinch's records are provided from April 2003 to May 2004. (Pls.' Ex. B.) According to the time sheets, Tinch made about ten out-of-state runs spread from late October 2003 until early December 2003. (Id.) Otherwise, he made intrastate trips. According to Ernstes, Tinch made twenty out-of-state dump truck trips and twenty-eight out-of-state dump truck semi trips in 2003. (Def.'s Ex. A, Attachment 3.)

Towe's records are provided from late November 2003 to late December 2005. (Pls.' Ex. C.) According to his time sheets, Towe made about ten trips out of state in 2004 spread out from June until mid August with one in late October. (Id.) Towe also made trips on nineteen days in 2005, concentrated from January to February and July to August. (Id.), Ernstes summary claims that Towe made thirty-nine out of state semi trips in 2003, four in 2004 and none in 2005. (Def.'s Ex. A, Attachment 3.) It claims that Towe made five out-of-state dump truck runs in 2004 and thirty-nine out-of-state dump truck runs in 2005. (Id.)

[*8]  Both sides agree that during their employment, Plaintiffs would, from time to time, work more than forty hours a week. They were paid the same hourly rate for extra hours as for the first forty hours, not the one and half times their regular pay required by the FLSA. Both sides also agree that Ernstes qualifies for the motor carrier exemption for each Plaintiff for at least those weeks of their employment when they traveled out of state. The only issue to decide in these cross-motions is whether Ernstes qualifies for the motor carrier exemption of the FLSA for any additional period of time. [7]

7   Ernstes provides an affidavit from a former employee, Richard McVey, stating the Department of Labor told McVey that he and Plaintiff Tinch were not entitled to overtime because of the motor carrier exemption. (McVey Aff. P 17.) Ernstes also provides the affidavit of his lawyer, John P. Cook, who states that the Department of Labor told Cook that Ernstes was exempt. (Cook Aff. P 3.) Plaintiffs object that both of these statements are hearsay not within any exception, and they are correct. These statements do not cre-

ate a genuine issue of material fact and will not be considered in deciding the cross-motions. See Miles v. Coca-Cola Bottling Co., 360 F. Supp. 869, 870-71 (E.D. Wis. 1973); Fed. R. Civ. P 56(e).

[*9] II. DISCUSSION

Whether the motor carrier exemption applies in this case is a question of law, see Levinson v. Spector Motor Service, 330 U.S. 649, 672, 67 S. Ct. 931, 91 L. Ed. 1158 (1947), and thus a potential matter for summary judgment. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Baron v. City of Highland Park, 195 F.3d 333, 337-38 (7th Cir. 1999). On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56, ITT Indus. Credit Co. v. D.S. Am., Inc., 674 F. Supp. 1330, 1331 (N.D. Ill.1987), [*10] and the traditional rules for summary judgment apply even though both parties have moved for summary judgment. Blum v. Fisher & Fisher, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997).

In considering this motion, the court must examine the border separating the authority of the Departments of Labor and Transportation. This tricky jurisdictional question is a product of the histories of transportation industry regulation and of the FLSA. In 1935, Congress passed the Motor Carrier Act, a safety program a key component of which was to establish the maximum hours for a driver. See Southland Gasoline Co. v. Bayley, 319 U.S. 44, 48, 63 S. Ct. 917, 87 L. Ed. 1244 (1943). The FLSA, passed three years later in 1938, requires that employers pay their employees time and a half for each hour worked over forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA left the program of the Motor Carrier Act intact, exempting those under the Motor Carrier Act's jurisdiction from the FLSA overtime requirement. See 29 U.S.C. § 213(b)(1) (referring to 49 U.S.C. § 31502). [8] "Congress evidently relied upon the Motor Carrier provisions to work [*11] out satisfactory adjustments for employees charged with the safety of operations in a business requiring fluctuating hours of employment, without the burden of additional pay for over-

time." *Southland Gasoline*, 319 U.S. at 48. There can be no concurrent jurisdiction between the Department of Labor ("DOL"), responsible for enforcement of the FLSA, and the DOT, now responsible for enforcement of the Motor Carrier Act. *Levinson*, 330 U.S. at 661.

8   The administrative body charged with administering the Motor Carrier Act and the statutory source of the Act's jurisdictional reach have changed over time. The Department of Transportation, created in 1966, took over administering the Motor Carrier Act from the Interstate Commerce Commission. The original source of jurisdiction for the Department of Transportation was 49 U.S.C. § 304. Section 304 was renumbered in 1983 as Section 3102 of Title 49 without substantive changes. *See* Pub. L. No. 97-449, 96 Stat. 2413. In 1994, Section 3102 was renumbered and amended as Section 31502 of Title 49. *See* Pub. L. No. 103-272, 108 Stat. 745. To avoid confusion in this entry, the body administering the Motor Carrier Act will always be referred to as the Department of Transportation even if, at the time, the Interstate Commerce Commission was still administering the program.

[*12] The motor carrier exemption should be read in terms of the purposes of both the FLSA and the Motor Carrier Act. *See Southland Gasoline*, 319 U.S. at 47. Because Congress intended the FLSA to give "all our able-bodied working men and women a fair day's pay for a fair day's work" exemptions to it must be narrowly construed. *A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S. Ct. 807, 89 L. Ed. 1095 (1945); *see also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960). Defendants "bear[] the burden of proving the application of [the] exemption." *Klein v. Rush-Presbyterian-St. Luke's Medical Center*, 990 F.2d 279, 283 (7th Cir. 1993).

Yet properly understood the extent of the motor carrier exemption follows not only the negative contours of an exemption, but also the positive contours of a safety program. *See Levinson*, 330 U.S. at 676-77. The application of this program is described in 49 U.S.C. § 31502. It applies only to certain types of transportation, including transportation between states. 49 U.S.C. § 31502(a)(1) (referring to 49 U.S.C. § 13501(1)(A) [*13] ). It gives the Secretary of Transportation the power to set qualifications and maximum hours of service for employees of (1) "motor carriers" and (2) "private motor carriers" "when needed to promote safety of operation." 49 U.S.C. § 31502(b). A "motor carrier" is defined as a person "providing commercial motor vehicle . . . transportation for compensation." 49 U.S.C. § 13102. The parties do not seem to dispute that Ernstes is a motor carrier; they

dispute only whether Plaintiffs' duties qualify for the motor carrier exemption for every week of their employment. (Pls.' Reply Br. 2.)

There are a few cases that help elucidate the line between DOL and DOT jurisdiction when driver duties are split between intrastate and interstate travel. In *Morris v. McComb*, 332 U.S. 422, 68 S. Ct. 131, 92 L. Ed. 44 (1947), the Supreme Court vacated a Court of Appeals decision reversing a District Court's dismissal based on the motor carrier exemption and remanded the case back to the District Court. DOL sought to require Morris to pay his employees overtime. Morris received only 4% of its revenue from interstate commerce, *id.* at 427, and two of its [*14] drivers never even made a trip out of state, *id.* at 433. The Court reminded DOL that "it is 'the character of the activities rather than the proportion of either the employee's time or of his activities that determines'" the jurisdiction of the DOT. *Id.* at 431 (quoting *Levinson*, 330 U.S. at 674-675). Thus, if each driver had driven 4% of every day interstate, DOT would certainly have jurisdiction. The actual situation was "not distinguishable" from this. *Id.* at 434. The interstate trips were distributed throughout the year and each driver had a chance of being assigned to one of them. "These trips were thus a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers." *Id.* at 433. Every one of Morris's drivers was subject to the jurisdiction of DOT and thus subject to the FLSA exemption.

This analysis is conducted not on an enterprise level, but employee by employee. In *Goldberg v. Faber Industries, Inc.*, 291 F.2d 232 (7th Cir. 1961), the Seventh Circuit, reversing the judgment of the District Court, found that the motor carrier exemption did not apply [*15] to all the carrier's employees. Defendant operated ten plants to produce grease and animal products and employed twenty drivers to deliver meat scraps to the plants. *Id.* at 234. Each driver was assigned to a plant and a particular route; only five drivers had routes that took them out of state. *Id.* No driver assigned to an intrastate route ever handled an interstate one. *Id.* The District Court determined that because the exemption applied to the five drivers who drove out of state, it must apply to all the drivers. *Id.* The Seventh Circuit disagreed, noting that "the test is the nature of the transportation performed by the employees." *Id.* at 235. The fifteen drivers who only drove intrastate performed no activity which would subject them to the jurisdiction of the DOT; they were entitled to overtime pay. The court distinguished *Morris v. McComb* by explaining that even though two of Morris's drivers did not make any trips in interstate commerce, they "were subject, at any time, to be assigned to interstate trips, and that at some time during the year they

would, in all likelihood, share in the carrier's interstate commerce trips." [*16]  Id.

Together, these cases teach that being subject to interstate assignments is all that is required for DOT jurisdiction and that the employer must show that each employee meets this requirement. Both DOL and DOT have issued further interpretations of DOT's jurisdiction. DOL sets forth its interpretation of § 213(b)(1) in 29 C.F.R. § 782. DOL echoes the lessons from Morris and Faber that if a driver for a common carrier is or "is likely to be" "called upon in the course of his work to perform, either regularly or from time to time" the task of driving in interstate commerce, he will be subject to the exemption. See 29 C.F.R. § 782.2(b)(3). DOL also argues that some activities may be de minimis where they are "trivial, casual, and insignificant." Id. But it is unlikely that driving a truck could ever be de minimis. See Turk v. Buffets, Inc., 940 F. Supp. 1255, 1261 (N.D. Ill. 1996). DOL also believes that when an employee is shifted from job to job, "the exemption to him in a particular workweek is tested by application of the above principles to the job or jobs in which he is employed in that workweek." 29 C.F.R. § 782.2(b)(4) [*17] . In other words, the tradeoff between DOL and DOT regulation of an employee's maximum hours might change week to week based on what job or jobs the employee was assigned to and the duties of those jobs.

DOT has issued its own interpretation of the statute. 46 Fed. Reg. 37,902 (July 23, 1981). [9] It begins with the general rule that "even a minor involvement in interstate commerce as a regular part of an employee's duties will subject that employee to the jurisidiction of [DOT]." Id. (compiling numerous cases). It states that the "cases establish that a driver will remain under the jurisdiction of [DOT] for as long as the driver is in a position to be called upon to drive in interstate commerce as part of the driver's regular duties." Id. at 37,903. How to decide whether a driver is in that position was, according to DOT, an open question. DOT proposed requiring someone claiming jurisdiction to show that the employer engaged in interstate commerce within a reasonable time of the date jurisdiction is claimed and that the driver "could reasonably have been expected to make one of the carrier's interstate runs." Id. If a driver engages in interstate [*18] commerce or was subject to he, he should be under DOT jurisdiction "for a four-month period from the date of proof." Id. [10]

9    For some reason, this has never been codified in the C.F.R.

10    DOL and DOT seem to conflict on what period of time should be analyzed, each week or a four month period. Some cases imply that DOL's interpretation should govern. See Gerard v.

Northern Transp., LLC, 146 F. Supp. 2d 63, 67 (D. Me. 2001) (declining to follow DOT interpretation because First Circuit had applied DOL interpretation before DOT interpretation issued); Peraro v. Chemlawn Servs. Corp., 692 F. Supp. 109, 114 n.4 (D. Conn. 1988) (stating without explanation that DOL's interpretation controlling). Other courts have decided that DOT has the authority to decide. See Dole v. Circle "A" Construction, Inc., 738 F. Supp. 1313, 1321-22 (D. Idaho 1990) (noting that Ninth Circuit has determined that DOT's interpretation of Motor Carrier Act deserves deference). As will be shown below, it is not necessary to decide which is right to resolve the dispute in this case. Although, it appears that DOL itself applies DOT's analysis. See Badgett v. Rent-Way, Inc., 350 F. Supp. 2d 642, 657 (W.D. Penn. 2004) ("The Department of Labor has accepted this 4-month rule, as set out in its Field Operation Handbook.").

[*19]  The parties disagree as to how these principles apply to them. Plaintiffs believe that 29 C.F.R. § 782.7(b)(4) mandates this court to examine Plaintiffs' time sheets and determine which weeks Plaintiffs traveled out of state, holding them to be under the jurisdiction of DOT only in those weeks and subject to FLSA in all others. Ernstes argues that it is exempt from paying overtime for the entire time in question because it solicited out-of-state business for which the Plaintiffs and all other drivers had an equal chance of being asked to drive. In the alternative, Ernstes argues that if it is liable for any overtime, the amount should be analyzed with DOT's four-month window in mind.

For their position that the court should look week by week, Plaintiffs cite McGee v. Corporate Express, 2003 U.S. Dist. LEXIS 20855, No. 01-1245, 2003 WL 22757757 (N.D. Ill. Nov. 20, 2003). McGee does not persuade this court to undergo Plaintiffs' week-by-week analysis. In McGee, the District Court denied both defendant's and plaintiffs' motions for summary judgment. 2003 U.S. Dist. LEXIS 20855, [WL] at *1. The court did not award plaintiffs overtime pay for each week they only drove intrastate; rather, with [*20] the evidence before it, the court could not decide as a matter of law whether Plaintiffs could have been asked to drive interstate. 2003 U.S. Dist. LEXIS 20855, [WL] at *7. Defendant was a courier service that operated a Chicago facility; plaintiffs were former couriers in the Chicago facility. 2003 U.S. Dist. LEXIS 20855, [WL] at *1. Both sides agreed that defendant did interstate business, but many of its employees claimed they were never taken off of their intrastate routes and only some of their duties could be considered interstate for the purposes of the Act. 2003 U.S. Dist. LEXIS 20855, [WL] at *2. The

court examined the DOL's interpretation of the motor carrier exemption and decided "the only way to determine the overtime compensation owed an employee is to look at the job duties held by the employee for each week of employment." 2003 U.S. Dist. LEXIS 20855, [WL] at *3. The court determined that plaintiffs were not entitled to overtime in the weeks they performed activities in interstate commerce.

But the court also noted DOT's interpretation of the statute, which says plaintiffs are under DOT jurisdiction if they "could have been" assigned to interstate duties. The court noted that the exemption "does not apply 'if there is no possibility of the individual driver doing [*21] interstate driving or if the possibility of interstate driving is remote." 2003 U.S. Dist. LEXIS 20855, [WL] at *6 (quoting 46 Fed. Reg. 37,902). The defendant in McGee contended that its supervisors randomly assigned interstate deliveries; however, the plaintiffs presented evidence that drivers were assigned to work routes on a permanent (or at least quasi-permanent) basis and that routes were reassigned only when someone did not come into work. 2003 U.S. Dist. LEXIS 20855, [WL] at *7. There was, according to the court, enough conflicting evidence on whether plaintiffs were likely to engage in interstate commerce to create a genuine issue of material fact. Id.

There is no such issue here. Taking the evidence in a light most favorable to them, Plaintiffs were likely to engage in interstate commerce during their entire employment. The vast majority of their time was spent traveling intrastate; however, it is not the proportion of intra to interstate travel that matters. Morris, 332 U.S. at 431. Ernstes engaged in interstate commerce and regularly assigned interstate jobs to dump truck drivers like Plaintiffs. Plaintiffs admit that they traveled out of state on multiple occasions. They had no set [*22] route like the Faber drivers, and it did not take something out of the ordinary to be assigned to an interstate run as alleged by the McGee drivers. The only thing that had to happen was that Ernstes receive interstate business and one of the Plaintiffs have the least amount of work to do when it came in. For each Plaintiff, this occurred multiple times during his employment. Plaintiffs provided no reason why they were any less likely to travel out of state during a particular part of their employment. Therefore, their out-of-state trips appear to be a "a natural, integral and apparently inseparable" part of their job duties. Id. at 433.

Plaintiffs argue that unlike the carrier in Morris, Ernstes did not really assign drivers indiscriminately. David Ernstes did state in his affidavit that he would honor specific driver requests not to go out of state and that sometimes drivers would refuse to go. Plaintiff Elliot also presents a unique factual scenario compared to the other Plaintiffs because Ernstes admits that Elliot was the least likely to be assigned to interstate runs because of his "problem with directions." (Ernstes Aff. P 14-15.)

These facts make [*23] no difference. The "indiscriminate assignment" formulation from Morris is just a shorthand way to get at the real issue--whether Plaintiffs could reasonably be expected to travel interstate as part of their duties. DOT made it clear in its interpretation that jurisdiction exists where the "driver could reasonably have been expected to make one of the carrier's interstate runs." 46 Fed. Reg. at 37,903. Any time during their employment, these drivers could have been asked to travel out of state. Ernstes solicited interstate business and each of the Plaintiffs did, in fact, take this business from time to time. Because of this, they needed to abide by all DOT regulations. Ernstes is entitled to the motor carrier exemption to the FLSA as a matter of law and its motion will be granted.

Because the court will grant the Defendant's motion for partial summary judgment, this will leave only the Plaintiffs state law claims. The general rule in this situation is that the court should give up jurisdiction to allow the claims to be decided in state court. Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1251 (7th Cir. 1994). None of the exceptions to this [*24] general rule are present in this case, id., so the court will relinquish jurisdiction on all of the state law claims as well.

### III. CONCLUSION

Because Defendant is entitled to the motor carrier exemption to the FLSA as a matter of law, its motion for partial summary judgment will be GRANTED. Plaintiffs' motion will be DENIED. The court will relinquish jurisdiction on the remaining state law claims so that they can be refiled in state court.

ALL OF WHICH IS ENTERED this 3rd day of October 2006.

John Daniel Tinder, Judge

United States District Court

LEXSEE



Analysis
As of: Mar 11, 2013

**HECTOR L. GARCIA, GEORGE CHAMMAS, Plaintiff, -vs- FLEETWOOD
LIMOUSINE, INC., GHALEB ABURISH, individually, SAMIH IBRAHIM
ABURISH, individually, NINA SAMIH ABURISH, individually, Defendants.**

Case No. 6:05-cv-673-Orl-KRS

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
FLORIDA, ORLANDO DIVISION**

**2007 U.S. Dist. LEXIS 82034**

**November 5, 2007, Decided
November 5, 2007, Filed**

**PRIOR HISTORY:** Garcia v. Fleetwood Limousine,
Inc., 511 F. Supp. 2d 1233, 2007 U.S. Dist. LEXIS
10302 (M.D. Fla., Feb. 14, 2007)

**CORE TERMS:** driver's, transportation, passengers,
carrier, airport, route, interstate, trip, hotel, drove, inter-
state commerce, exemption, drive, per hour, transport,
overtime, Motor Carrier Act, motor vehicle, airline,
crew, overtime compensation, regular rate, trial tran-
script, assigned, times, charter, conclusions of law,
transportation of passengers, air carrier, counterclaim

**COUNSEL:** [*1] For Hector L. Garcia, and others
similarly situated, Plaintiff: N. James Turner,PA, LEAD
ATTORNEY, Orlando, FL.

For George E. Chammas, Plaintiff: N. James Turner, PA,
LEAD ATTORNEY, Orlando, FL.

For Fleetwood Limousine, Inc., Defendant: Albert E.
Ford, II, PA, LEAD ATTORNEY, Lake Mary, FL.

For Ghaleb Aburish, individually, Defendant: Albert E.
Ford, II, PA, LEAD ATTORNEY, Lake Mary, FL.

For Samih Ibrahim Aburish, individually, Defendant:
Albert E. Ford, II, PA, LEAD ATTORNEY, Lake Mary,
FL.

For Nina Samih Aburish, individually, Defendant: Albert
E. Ford, II, PA, LEAD ATTORNEY, Lake Mary, FL.

For George E. Chammas, Counter Defendant: N. James
Turner, PA, LEAD ATTORNEY, Orlando, FL.

For Fleetwood Limousine, Inc., Counter Claimant: Al-
bert E. Ford, II, PA, LEAD ATTORNEY, Lake Mary,
FL.

For Ghaleb Aburish, individually, Counter Claimant:
Albert E. Ford, II, PA, LEAD ATTORNEY, Lake Mary,
FL.

For Hector L. Garcia, and others similarly situated,
Counter Defendant: N. James Turner, PA, LEAD AT-
TORNEY, Orlando, FL.

For Samih Ibrahim Aburish, individually, Counter
Claimant: Albert E. Ford, II, PA, LEAD ATTORNEY,
Lake Mary, FL.

For Nina Samih Aburish, individually, Counter Claim-
ant: Albert E. Ford, II, PA, [*2] LEAD ATTORNEY,
Lake Mary, FL.

**JUDGES:** KARLA R. SPAULDING, UNITED
STATES MAGISTRATE JUDGE.

**OPINION BY:** KARLA R. SPAULDING

**OPINION**

## TRIAL ORDER

This cause came on for a non-jury trial before Magistrate Judge James G. Glazebrook on April 5, 2007. After Judge Glazebrook's death, counsel for all parties appeared before me for a status conference. The parties consented to disposition of the case by me, and requested that the matter be submitted on the existing record, with each side being given the opportunity to file post-trial memoranda of law. Doc. No. 94 at 3-4. The memoranda of law have been submitted, doc. nos. 98, 99, I have reviewed the trial transcript, and I am otherwise thoroughly familiar with the case file. Accordingly, the case is ripe for resolution.

As a preliminary matter, counsel for Defendants argues that Judge Glazebrook made findings of fact and conclusions of law on the record at the conclusion of the trial. After review of the trial transcript, I conclude that while Judge Glazebrook stated his intended ruling, he did not make findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). Rather, Judge Glazebrook expressly stated that he would lay out his ruling through [*3] a written order. Doc. No. 96 at 253 (Trial Transcript hereinafter cited as "TR.").

Upon a *de novo* review of the trial transcript, I render a verdict in favor of Defendants Fleetwood Limousine, Inc., Samih Ibrahim Aburish, Nina Samih Aburish and Ghaleb Aburish. I also find that Defendants abandoned their counterclaim.

## I. FINDINGS OF FACT.

1. Fleetwood Limousine, Inc. ("Fleetwood") was founded in 1997, and has its business office in the Orlando, Florida area. TR. 157.

2. Samih Ibrahim Aburish ("S.I. Aburish") is the founder and managing director of Fleetwood. TR. 15, 156-57. He is in charge of the daily operation of Fleetwood. TR. 157.

3. Nida Aburish is the Chairman, President and 100% shareholder of Fleetwood. TR. 15-16.

4. Ghaleb Aburish is the Vice-President of Fleetwood. TR. 16.

5. Goldie Kier began work for Fleetwood in 2003 as the office manager, receptionist and bookkeeper. TR. 181-82, 196.

6. Gustavo ("Gus") Carvajal began work for Fleetwood in 1999 as the dispatching supervisor. TR. 197-98.

7. Fleetwood transports passengers on buses operated on interstate highways. TR. 180.

8. Sometime before 2001, Fleetwood obtained a certificate from the Interstate Commerce Commission (ICC) permitting [*4] it to transport passengers in interstate and foreign commerce. TR. 161-62. *See also* Def. Ex. 3. It maintains its vehicles in accordance with federal regulations. TR. 21.

9. The number of hours that bus drivers working for Fleetwood can drive are regulated by the Department of Transportation (DOT). TR. 172, 192. Fleetwood maintains logs of the number of hours each driver works. TR. 21. DOT inspects Fleetwood's safety and hourly records at least once a year. TR. 21-22, 173, 192-94.

10. Fleetwood paid its drivers $ 8.00 per hour which later increased to up to $ 10.00 per hour. TR. 171.

11. Fleetwood drivers were required to drive any route assigned to them. TR. 30, 56-57, 76, 78, 200. [1]

> 1 The evidence was disputed whether Plaintiffs were ever told that they must be available to travel outside Florida. *Compare* TR. 44-45 *with* TR. 66-67. I need not resolve this credibility issue for purposes of determining the application of the motor carrier exemption.

12. All Fleetwood trips are prepaid to Fleetwood. Drivers do not collect from the passengers. TR. 209.

13. Fleetwood has contracts with hotels in the Orlando area to transport the hotels' guests. Fleetwood is paid by the hotels for this transportation. [*5] TR. 17.

14. Fleetwood also enters into contracts with travel agents, tour businesses and conventions for transportation of passengers within Florida, which it refers to as charter work. These contracts are done on a trip by trip basis. TR. 18-19, 48-49, 53, 157-58. These groups handled tours for individuals traveling to Orlando from outside Florida. TR. 48-49, 163; *see also* TR. 162 (Fleetwood usually transports out-of-state and international customers), 169 (approximately 95% to 98% of the passengers on charters were from outside Florida). This work included picking up passengers at the airport and Amtrak station. TR. 55-56, 158.

15. Additionally, airline carriers contracted with Fleetwood to pick up flight crews at the airport and transport them to Orlando area hotels and from the hotels back to the airport. TR. 46-48, 58-59. The airline crews had traveled to Orlando from places outside Florida. TR. 48.

16. Fleetwood advertises its services to include "Out of Town" trips. Def. Ex. 7; *see also* TR. 159, 231-34 (Fleetwood distributed 10,000 to 15,000 of the advertisements). One or two months before the trial in this case, Fleetwood drivers went to Savannah, Georgia, and

to Biloxi, Mississippi.   [*6] TR. 21, 26. On an unspecified date, a Fleetwood driver also went to Washington, D.C. TR. 27. [2]

> 2   These out-of-state trips did not occur on days when Plaintiff Garcia was at work. TR. 67.

17. Fleetwood drivers routinely worked more than forty hours a week, but were not paid overtime compensation. TR. 171-72. S.I. Aburish checked with lawyers and determined that Fleetwood was not required to pay overtime compensation to its drivers. TR. 146-47.

18. In approximately 2002, a representative from the Department of Labor reviewed Fleetwood's records based on a report from a driver that Fleetwood did not pay overtime compensation. The Department of Labor did not take any action. TR. 173-74, 196.

19. Plaintiff Hector L. Garcia was employed by Fleetwood from 2003 through 2005 as a bus driver. TR. 63-64, 68-69. [3] He has a commercial driver's license (CDL). TR. 77, 90. On his application, Garcia indicated that he could travel if a job required it. TR. 37-41 & Def. Ex. 22(D)(6).In a Driver History form dated August 21, 2003, Garcia indicated that his "radius of use" of Fleetwood vehicles was over 100 miles. Def. Ex. 22(D)(8).

> 3   It appears that Garcia was employed by American United Employers as of September [*7] 2003. Def. Ex. 22(D)(10). If American United Employers was a staffing agency, as it appears may be the case from the exhibits introduced at trial, Fleetwood could, nevertheless, continue to be the employer of Garcia for purposes of the FLSA. Cf. 29 C.F.R. § 791.2(b)("Joint Employment"). No argument has been made by any party that Garcia's employment by American United Employers alters the analysis of the legal issue presented at trial.

20. Garcia first drove a shuttle route to Downtown Disney. TR. 74. Thereafter, he drove a tip route, which is a route between hotels and theme parks for which drivers were allowed to accept tips. TR. 64-65, 127-30.

21. Garcia never drove outside Florida. TR. 67, 216.

22. There was a dispute with respect to whether Garcia ever drove passengers to the airport. TR. 118, 206, 215. [4] Garcia admitted driving one charter group to an Amtrak station. TR. 119-21, 123, 178.

> 4   I need not make a credibility finding, because there was no dispute that Garcia could have been assigned to drive passengers to and from the airport.

23. Garcia worked 499 hours of overtime while employed by Fleetwood, for which he was not compensated at one and one-half times the regular rate at   [*8] which he was employed. Doc. No. 75 at 11. Garcia was paid $ 8.00 per hour from the commencement of his employment to December 17, 2003. Effective December 18, 2003, he was paid $ 8.25 per hour. Def. Ex. 22(D)(1).

24. Garcia asked the dispatcher supervisor, Gustavo Carvajal, why Fleetwood did not pay overtime. Gus told him to take it up with S.I Aburish. TR. 119.

25. Plaintiff George Chammas was employed by Fleetwood between 1999 and 2005. He primarily drove passengers to theme parks. TR. 131.

26. Once a year, Chammas picked up passengers at the airport and took them to a hotel. TR. 132, 134-37.

27. Chammas never drove outside Florida. TR. 141, 215.

28. Chammas worked more than forty hours a week, but he was not paid one and one-half times his regular rate of pay for his overtime work. TR. 132. As of March 2003, Chammas was paid$ 8.25 per hour. Plf. Ex. 5. As of April 2004, Chammas was paid $ 8.40 per hour. Id. As of April 2005, Chammas was paid $ 9.00 per hour. Id. The overtime hours Chammas worked are set forth in a summary chart admitted into evidence. Plf. Ex. 6.

## II. CONCLUSIONS OF LAW.

1. Under the Fair Labor Standards Act (FLSA), an employer must pay one and one-half times the employee's   [*9] regular rate for all hours worked in excess of forty hours per work week. 29 U.S.C. § 207(a)(1).

2. There is no dispute that Fleetwood is an employer as defined by the FLSA.

3. There is no dispute that Plaintiffs were employed by Fleetwood.

4. There is no dispute that each Plaintiff worked more than forty hours a week but was not paid one and one-half times his regular rate of pay by Fleetwood.

5. The only defense Fleetwood raised in this case was that its drivers are exempt from the FLSA. Doc. No. 52 at 3; Doc. No. 75 at 5-8.

6. Defendants have the burden of proving by a preponderance of the evidence that they were exempt from payment of overtime compensation to Garcia and Chammas under the "motor carrier exemption," 29 U.S.C. § 213(b)(1). See Atlanta Prof'l Firefighters Union v. City of Atlanta, 920 F.2d 800, 804 (11th Cir. 1991).

7. The Court must construe all exemptions from the overtime provisions of the FLSA narrowly against the

employer. *Hogan v. Allstate Ins. Co.,* 361 F.3d 621, 625 (11th Cir. 2004).

8. The motor carrier exemption provides that the FLSA's overtime provisions "shall not apply with respect to any employee with respect to whom the Secretary of Transportation has power [*10] to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act]." 29 U.S.C. § 213(b)(1).

9. "The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees . . . extends to those classes of employees and those only who: (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under . . . the Motor Carrier Act . . ., and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles [5] in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a).

> [5] Turning to the second factor of the exemption, as full-time drivers of motor vehicles, Garcia and Chammas's work directly affected the safety of operation of motor vehicles in the transportation of passengers on public highways to the extent that work is done in interstate commerce. *Morris v. McComb,* 332 U.S. 422, 430, 68 S. Ct. 131, 92 L. Ed. 44 (1947).

10. Under the Motor Carrier Act (the "Act"), the Secretary of Transportation (the "Secretary") has jurisdiction [*11] over "transportation by motor carrier and the procurement of that transportation to the extent that passengers, property, or both, are transported by motor carrier. . . between a place in . . . a State and a place in another State [and] . . . a State and another place in the same State through another State." 49 U.S.C. § 13501(1)(A)-(B).

11. A "motor carrier" is defined as "a person providing commercial motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). There is no dispute that Fleetwood is a motor carrier as defined by the Act. *See* Docket No. 88 at 6.

12. Fleetwood engages in transportation by motor carrier and the procurement of such transportation between Florida and other states when it advertises for and transports passengers between Florida and other states. *See, e.g., Morrison v. Quality Transports Servs., Inc.,* 474 F. Supp. 2d 1303, 1309 (S.D. Fla. 2007)(and cases cited therein). As such, it is within the jurisdiction of the Secretary.

13. Simply because the Secretary has jurisdiction over Fleetwood does not give her jurisdiction over all drivers employed by Fleetwood. *See Morrison,* 474 F. Supp. 2d at 1309. Correspondingly, "the activities of drivers . . . [*12] in connection with transportation that is not in interstate . . . commerce within the meaning of the Motor Carrier Act provide no basis for exemption" under the FLSA. 29 C.F.R. § 782.2(d).

14. The Secretary's jurisdiction under the Act "extends 'only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility.'" *Morrison,* 474 F. Supp. 2d at 1309 (quoting *Garcia v. Pace Suburban Bus Serv.,* 955 F. Supp. 75, 77 (N.D. Ill. 1996)).

15. Fleetwood advertised its ability to drive passengers from and to Florida from other states. The evidence established that Fleetwood actually conducted such trips during that time that it employed Garcia and Chammas. Even though neither Garcia nor Chammas drove any interstate trips, they could have been assigned to do so. Therefore, Garcia and Chammas could reasonably have been expected to drive an interstate trip for Fleetwood. *See Morris,* 332 U.S. at 431-36.

16. With respect to purely intrastate trips, the regulations relating to the FLSA presume that transportation within a single state is in interstate commerce when "it forms a part of a 'practical continuity of movement' across State [*13] lines from the point of origin to the point of destination" unless the ICC, the Secretary or the courts hold otherwise. 29 C.F.R. 782.7(b)(1).

17. The ICC has found that "motor transportation wholly within a single State of passengers, or groups of passengers, between an airport and another point in the same State, either prior or subsequent to an interstate air movement from or to the airport, (1) is an intrastate movement where there is no arrangement between the motor carrier and the air carrier for continuous passage or interchange, and (2) is an interstate movement where there is an arrangement (referred to as a 'common arrangement' or 'through ticketing') between the motor carrier and the air carrier for continuous passage or interchange." *In re Kimball,* 131 M.C.C. 908, 917 (I.C.C. 1980).

18. Fleetwood has contracts with air carriers for transportation of airline crew members between the airport and hotels. This activity is interstate commerce as interpreted by the ICC in *Kimball.* Because Chammas actually drove airport routes, and Garcia reasonably could have expected to be assigned an airport route, both Garcia and Chammas could reasonably have expected to have driven airline [*14] crew members to and from the airport.

19. Accordingly, based on the preponderance of the evidence, because Garcia and Chammas could reasonably have been expected to drive interstate routes and intrastate routes that are considered interstate under the governing law, Garcia and Chammas were exempt from the FLSA under the motor carriers exemption. [6]

> 6   Because I find that Garcia and Chammas reasonably could have been expected to drive Fleetwood routes that constitute interstate commerce, I need not address whether the charter routes, tip routes and shuttle routes not involving airline crew members constitute interstate commerce for purposes of the Act.

20. Defendants abandoned their counterclaim by failing to include it in the pretrial statement, Local Rule 3.06(e), and by failing to offer evidence in support of it at trial.

**III. CONCLUSION.**

Accordingly, it is **ORDERED** that the Clerk of Court shall enter a judgment in favor of Defendants Fleetwood Limousine, Inc., Samih Ibrahim Aburish, Nina Samih Aburish and Ghaleb Aburish and against Plaintiffs Hector L. Garcia and George Chammas with respect to Count I and Count II of the Second Amended Complaint and Demand for Jury Trial, doc. no. 50. It [*15] is further **ORDERED** that the counterclaim is **DISMISSED**. After judgment is entered, the Clerk of Court is directed to close the file.

**DONE** and **ORDERED** in Orlando, Florida on November 5, 2007.

KARLA R. SPAULDING

UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record